**OMAN INTERNATIONAL FINANCE LTD., Plaintiff,**

v.

**HOIYONG GEMS CORPORATION and Hoiyong Gems Corp., Defendants.**

**Civ. A. No. 84–0050–S.**

United States District Court, D. Rhode Island.

July 30, 1985.

Adler, Pollock & Sheehan, Inc., John A. Tarantino, John F. Bomster, Providence, R.I., for plaintiff.

Tillinghast, Collins & Graham, James E. Purcell, Daniel C. Waugh, Providence, R.I., for defendants.

## Opinion and Order

SELYA, District Judge.

This civil action, prosecuted by Oman International Finance Ltd., presents a tangram which adds measurably to the lore of Oriental intrigue. Suit was brought in this court against two defendants: Hoiyong Gems Corporation (H–RI), a Rhode Island corporation, and Hoiyong Gems Corp. (H–NY), a New York corporation.[1] The comediatta was played out to the court in a bench trial which began on December 20, 1984, was heard irregularly thereafter, and limped to a close on April 11, 1985. A post-trial briefing schedule subsequently ran its course. Oral arguments having been waived, this rescript comprises the court's findings of fact and conclusions of law as required by Fed.R.Civ.P. 52(a).

### I.

The pertinent facts are subject to some dispute, and the court narrates its deciphered version of them. (Further findings of fact are tucked into various nooks and crannies of the conclusions of law which follow.)

In early 1982, one Johnny Ho, a Chinese merchant, acted as a middleman in Hong Kong, bringing to the Bank of Oman and its subsidiary, Oman International Finance, Ltd. (hereinafter collectively "Oman" or "the lender"), a financing proposition on behalf of S.C. Wong Jewellery Products (Far East) Ltd. (WJP Co.). The moving force behind WJP Co. was its managing director, S.C. Wong a/k/a Wong Siu Chun (Wong). Following this initial contact, and other polite sparring which need not be recounted here, negotiations ensued. Two officers of Oman, Messrs. Maraikkadan and Charloo, became deeply involved in these dealings. Internuncioes were regularly employed due to language barriers.

In relatively short order, Oman agreed to extend significant credit to WJP Co., proposing as conditions thereto (i) an impressed subordinated compensating balance deposit of HK $2,000,000, (ii) the personal guarantees of Mr. and Mrs. Wong, and (iii) the guaranty of an entity loosely referred to as "Hoiyong Gems Corp. U.S.

---

1. Process was served upon both H–NY and H–RI. The former did not defend, and a default was entered against it prior to trial. Thus, for purposes of this account, the court treats H–RI as the sole defendant.

A." (which Oman believed to be the parent corporation, or holding company, of WJP Co.). The first two preconditions were met, and the lender began making advances in substantial amounts to the order of WJP Co. without further ado.

The proposed corporate guaranty was the topic of heated debate at the trial. The defendant contends that Oman waived this condition (and it is clear, at the least, that the lender initially put itself at risk without having a written corporate guaranty in its possession). The plaintiff insists that the furnishing of the corporate guaranty was of the essence of the transaction, and produced two such guarantees at trial (Exhibits 5 and 6).[2] (The defendants branded these documents as bogus, and offered expert testimony on the point; the court deals with this contention *post.*) And, assuming arguendo that a valid and binding guaranty was tendered, the parties vehemently disagree as to the identity of the putative guarantor: Oman claims that it had in hand the assurance of H–RI; the defendant asseverates that, at most, the lender held the guaranty of H–NY.

At this juncture, some comment is required as to the melange of similarly named corporations. H–NY, organized in New York in 1976, did business as an importer, receiving goods on consignment from abroad and marketing them in the United States. H–NY held the majority interest (90%–96%) in WJP Co. H–RI was incorporated under Rhode Island law some five years later. The record in uncontradicted that H–RI did no business directly in Hong Kong, although it did order merchandise from that locale (at least some of which was requisitioned through WJP Co.). H–RI was based in Providence. There was yet a third entity with much the same cognomen: Hoiyong Gems Corporation of California (H–Cal). H–Cal was chartered in 1982 or 1983; its headquarters were in Los Angeles; and its operations were substantially similar to those of H–RI. It was apparently intended to function as H–RI's west coast counterpart. Wong was, in effect, the principal owner of each of these entities.

Though the business relationship appeared inviting to the lender in early 1982 when the arrangement materialized (after all, WJP Co. was represented as being a thriving concern, with 350–400 employees and monthly sales of HK$6,000,000 to HK$8,000,000, and had favored the bank with a sizable up-front deposit), the storm clouds soon gathered. The debtor encountered financial difficulties later in 1982 and the lender was unable to recoup its advances entirely. Faced with an unwanted potential write-off of $690,659.08, Oman instituted legal actions in Hong Kong aimed at reaching the coffers of H–NY and H–RI. The plaintiff received uncontested foreign judgments against both American corporations, and this suit followed apace.

## II.

The issues in the case prescind from the second amended complaint. That pleading was framed in five counts. As the third statement of claim ran only against the defaulted defendant, it need not be discussed herein. The four remaining claims implicated H–RI. Therein, the plaintiff promulgated three basic causes of action: guarantor liability, debt on judgment and liability by association (the last of which was asserted in two separate but intertwined counts). The court will proceed to deal with these initiatives seriatim.

## III.

The chief protagonists as to the guaranty issue were Charloo and Wong. Charloo was Oman's general manager in Hong

---

2. The two guarantees were supposedly submitted at different times, because of a variation in the credit terms. The first was for HK$7,000,000 and the second was for HK$7,500,000; otherwise, the documents were substantially identical. Inasmuch as the second was designed to replace and supplant the first, the court can, for substantive purposes, treat them as a single guaranty, and will sometimes refer to them collectively in the singular. Yet, for evidentiary purposes, in determining whether H–RI ever became a guarantor of WJP Co.'s debt at all, the two documents have distinct significance. *See* text *post.*

Kong and the head of the bank's credit committee there. Charloo testified that he knew from the time the negotiations commenced that Wong's American interests had shifted their focus from New York to Rhode Island; that he insisted upon (and obtained) the corporate guaranty of H–RI for the credit line; and that the guaranty was in full force at all times material to the events which followed. Wong's testimony was to the contrary: he denied that he agreed to give Oman *any* corporate guaranty, let alone H–RI's assurance; he forswore any discussions of the Rhode Island operation with Charloo at the critical time; he branded the documents which the plaintiff produced at trial (Exhibits 5 and 6) as ersatz; and he disclaimed the notion that H–RI was in any way implicated in WJP Co.'s dealings with the lender. To the extent that Wong's stateside operations were discussed with Oman's officials, he said, the focus was entirely on the New York-based enterprise. The battle lines were clearly drawn. The court finds Wong's version of the events in question to be more plausible than Charloo's. The reasons are many.

Charloo was a disappointing witness. He contradicted himself numerous times while testifying, and keen cross-examination revealed more than one significant misstatement on his part. By way of illustration, he dissembled as to the timing of the advances vis-a-vis the paperwork and in claiming that he had seen the fully-typed guarantees before they were supposedly forwarded for signature. He struck the court as a bank officer who had fumbled the ball and who was thrashing about in some desperation to place the onus elsewhere. The court finds that he never knew of the existence of H–RI and declined to make even the most elementary investigation into the finances of H–NY. In short, his business judgment was totally submerged by a self-induced mirage: the lure of the easy money presumably to be made by his employer as WJP Co.'s financier. Wong, on the other hand, though encumbered by self-interest and no model of rectitude, was more straightforward. This was not a case where the factfinder had the luxury of choosing between a paragon of verity and an unmitigated liar. Blacks and whites were seldom to be found on a scumbled record dominated by shadings of gray. Yet, as to the existence *vel non* of a guaranty by H–RI, Wong was simply more believable than Charloo.

Nor is the court's finding dependent solely on a credibility judgment as between the two principal players. The documentary evidence—much of it from Oman's own records—tracked in the same direction. Oman's responses during the course of pretrial discovery also bolstered its adversary's theory of the case in certain particulars. *E.g.,* Exhibit L. The timing of Oman's advances to WJP Co. vis-a-vis the dates of supposed receipt of the purported documents was itself suggestive. But, there was more.

The lender listed a New York address (H–NY's address, to be precise) for the corporate guarantor. (Though Charloo equivocated on this point, the plaintiff's answers to interrogatories made it clear.) References were made to "directors"—a commodity which H–NY alone possessed (H–RI was a close corporation which, as was permissible under Rhode Island law, had no board of directors). The lender's records reflected a date of incorporation for the corporate guarantor which paralleled H–NY's inception (July 14, 1976) and which predated the birth of H–RI by more than 5 years. Oman, in cataloguing the information needed for its final credit proposal, took particular heed of an inter-corporate indebtedness (HK$4,710,252.86) owed by the putative guarantor to WJP Co. as of December 31, 1980; H–RI, which was not established until mid-1981, could not have been the debtor in that instance.

Virtually all of Oman's allusions to its supposed surety referred to the guarantor as a "holding company" for WJP Co.; H–NY owned most of the stock in the operating firm, whereas H–RI owned none. A New York banking reference was used. This was exclusively an H–NY link; no connection between the New York institu-

tion and H–RI was shown. When the lender called the loan on November 1, 1982, no demand letter was sent to H–RI (or to the Rhode Island address which Charloo contended that he knew of all along). Indeed, the guaranty documents offered by Oman at trial bore H–NY's correct corporate name, not H–RI's (the two names were similar, *but not identical*).

Moreover, the lender's normal practice was to obtain certified corporate resolutions attesting to the validity of corporate guarantees taken to secure credit transactions. Oman had none from H–RI, the absence thereof was never satisfactorily explained, and H–RI's corporate minute book did not show that such a transaction had ever been authorized. Furthermore, H–RI's by-laws required a vote of its shareholders to sanction such an indemnity. None such was of record. What is more, Wong's testimony as to a waiver of the original stipulation for a hold-harmless agreement was bulwarked by documentation in the lender's own files. *See* Exhibit N. No formal refusal of that exemptive request was proffered. Exhibit N is all the more damning because it was written *after* the date when Charloo (untruthfully) claimed to have had the first of the H–RI guarantees in hand. And, this exhibit is of a piece with earlier correspondence between the parties. *Compare* Exhibit M (lender's March 1, 1982 request, inter alia, for confirmation that sundry guarantees would be tendered) *with* Exhibit 7 (borrower's reply of March 5, 1982 acknowledging that personal guarantees would be made available if required, but failing to confirm willingness to supply any corporate guaranty).

Then, too, the lender had the burden of proof. Several of its officials, apart from Charloo, were in a position to have had highly pertinent knowledge (Maraikkadan and Yick, to name but two); none came forward to offer evidence. No witness appeared to authenticate Wong's signature on the relevant documents or to attest to his execution thereof. The bank officers who supposedly "verified" Wong's signature on the guarantees by initialling the instruments were not produced. The court understands that geography and distance may have disadvantaged the plaintiff in producing its employees at the trial, but deposition practice was available to it under the Federal Rules. And, at the bottom line, hardship of this sort cannot serve as a surrogate for proof.

Further, the defendant's expert witnesses—a graphologist (McCann) and a forensic chemist (Oakes)—were extremely convincing. The sum and substance of their joint testimony was that the corporate name had been typed onto the guarantees *after* Wong had signed them. The evidence given by McCann and Oakes was consistent with Wong's statement that he had signed the forms in blank, intending only to extend his individual assurance of payment. And, the belated placement of typewriting and a corporate "chop" on the documents—alien to H–RI, as matters turned out—was of a piece with this hint of skulduggery. The plain inference—that Oman surreptitiously attempted to convert executed copies of Wong's personal guaranty into corporate guarantees after the fact—is a compelling one. The court so finds.

■ The court is satisfied that the parties never intended that H–RI guarantee the obligations of WJP Co. to Oman, and that no guaranty of, or binding upon, H–RI was ever validly executed and delivered to the lender. That being so, the plaintiff's cause of action predicated upon the terms of the supposed assurance (Count II of the second amended complaint) necessarily falters.

## IV.

The next claim to be examined arises out of a judgment which Oman obtained in a Hong Kong court against H–RI in the wake of WJP Co.'s defailance in payment of the balance of its debt. The underlying facts brook no dispute: Oman sued on the guaranty, H–RI was served with process

pursuant to the Hague Convention,[3] it neither answered nor appeared, and Oman was awarded a hefty default judgment ($724,474.70) against H–RI. The lender now seeks to enforce that foreign judgment in this action. In light of this court's findings as to the illegitimacy of the putative guaranty, *see* text *ante* at Part III, the court need not tarry unduly in respect to this purported cause of action. (It should be noted in passing that Oman's principal basis for asserting that the Hong Kong judgment merited this court's hospitality was that the indemnitor, by the execution of the guaranty, specifically submitted itself to the jurisdiction of the colony's courts, *e.g.,* Exhibit 5 at ¶ 9; Exhibit 6 at ¶ 9; inasmuch as H–RI did not sign and deliver the instrument, however, this ground is totally undercut.)

■ It has long been settled that, while considerations of international comity may support enforcement of an alien judgment in an American court, that result is not an inevitable one. In an exhaustive treatment of the subject, the Court held, almost a century ago:

[W]e are satisfied that, where there has been opportunity for a full and fair trial abroad before a court of competent jurisdiction, conducting the trial upon regular proceedings, after due citation or voluntary appearance of the defendant, and under a system of jurisprudence likely to secure an impartial administration of justice between the citizens of its own country and those of other countries, and there is nothing to show either prejudice in the court, or in the system of laws under which it was sitting, or fraud in procuring the judgment, or any other special reason why the comity of this nation should not allow it full effect, the merits of the case should not, in an action brought in this country upon the judgment, be tried afresh, as on a new trial or an appeal, upon the mere assertion of the party that the judgment was erroneous in law or in fact.

*Hilton v. Guyot,* 159 U.S. 113, 202–03, 16 S.Ct. 139, 158, 40 L.Ed. 95 (1895) (Gray, J.).

*Hilton,* in effect, expanded the rule previously enunciated in admiralty proceedings in rem to more transitory in personam actions (such as the instant suit for money damages). Mr. Justice Gray's trenchant remarks hark back to a venerable privateering case, *Rose v. Himely,* 8 U.S. (4 Cranch) 241, 2 L.Ed. 608 (1808), wherein Chief Justice Marshall, speaking for a divided Court,[4] noted:

Upon principle, it would seem, that the operation of every judgment must depend on the power of the court to render that judgment; or, in other words, on its jurisdiction over the subject matter which it has determined.... Upon principle, then, it would seem, that, to a certain extent, the capacity of the court to act upon the thing condemned, arising from its being within, or without their jurisdiction, as well as the constitution of the court, may be considered by that tribunal which is to decide on the effect of the sentence.

*Id.* at 268.

■ In this century, the federal courts have consistently hewed to the *Hilton* line in weighing the effect to be given to a foreign judgment. *E.g., Somportex Ltd. v. Philadelphia Chewing Gum Corp.,* 453 F.2d 435, 440–41 (3d Cir.1971), *cert. denied,* 405 U.S. 1017, 92 S.Ct. 1294, 31 L.Ed.2d 479 (1972); *Todd Shipyards Corporation v. F/V Maigus Luck,* 243 F.Supp. 8, 10 (D.C. Z.1965). If, as H–RI contends, the Hong Kong court was without jurisdiction, if there was no "due citation" of the defendant (which eschewed any voluntary appear-

---

**3.** The Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, done November 15, 1965, 20 U.S.T. 361, T.I.A.S. No. 6638, 658 U.N.T.S. 163 (1969).

**4.** Mr. Justice Livingstone, with whom Justices

ance), the decree entered in the crown colony is but a meaningless piece of paper.[5]

Once it is established that H–RI did not guarantee WJP Co.'s indebtedness to Oman, *see* text *ante* at Part III, the lender's claim that the defendant was subject to the jurisdiction of a Hong Kong court becomes as shaky as an alcoholic's hand. ▉ The plaintiff, of course, had the burden of proof on the issue. *Cf. Escude Cruz v. Ortho Pharmaceutical Corp.*, 619 F.2d 902, 904 (1st Cir.1980). The critical inquiry in this regard is a familiar one; jurisdiction depends on principles of due process. The reviewing court must determine whether the defendant's contacts with the original venue (in this case, Hong Kong) were such that maintenance of the earlier suit and the requirement that the defendant be bound by the judgment therein comport with "traditional notions of fair play and substantial justice." *Milliken v. Meyer*, 311 U.S. 457, 463, 61 S.Ct. 339, 343, 85 L.Ed. 278 (1940). Of central relevance to this equation is the degree to which a defendant has "purposefully avail[ed] itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws." *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct.

1228, 1240, 2 L.Ed.2d 1283 (1958). To construct the calculus, the court must ascertain "the quality and nature of the activity in relation to the fair and orderly administration of the laws which it was the purpose of the due process clause to insure." *International Shoe Co. v. Washington*, 326 U.S. 310, 319, 66 S.Ct. 154, 160, 90 L.Ed. 95 (1945). And, insofar as the views of the Rhode Island courts are germane to this issue, they track federal principles. Rhode Island has, for example, consistently interpreted its statutory mosaic as permitting the exercise of jurisdiction up to the federal constitutional limit. *See Conn v. ITT Aetna Finance Co.*, 105 R.I. 397, 402, 252 A.2d 184, 186 (1969). *See also Forsythe v. Cohen*, 305 F.Supp. 1194, 1197 (D.R.I.1969) (applying Rhode Island law).

Inasmuch as H–RI never agreed to stand as surety for the debts incurred by WJP Co. in Hong Kong, and did not do so, *see* text *ante* at Part III, Oman cannot haul itself up in a jurisdictional sense by using the supposed guaranty as a bootstrap. When that reed is stripped from the lender's grasp, it becomes readily apparent that H–RI had no other meaningful contacts with or within Hong Kong such as would support a jurisdictional claim: it main-

Cushing and Chase joined, filed a brief concurring opinion; Mr. Justice Johnson dissented.

**5.** This action was brought in pursuance of this court's diversity jurisdiction. 28 U.S.C. § 1332. Thus, in the first instance, the court must look to Rhode Island law anent the enforceability of the off-shore decree. *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938); *Bank of Montreal v. Kough*, 430 F.Supp. 1243, 1246 (N.D.Cal.1977). There is no choice-of-law problem; the parties have briefed all state law questions in terms of Rhode Island's jurisprudence, so the court may accept the implicit concession that Rhode Island's substantive law governs in the premises. *See In re Pioneer Ford Sales, Inc. (Ford Motor Company)*, 729 F.2d 27, 31 (1st Cir.1984); *Lopez v. Bulova Watch Co.*, 582 F.Supp. 755, 757 n. 1 (D.R.I. 1984).

Although the state supreme court has not dealt expressly with the effect to be accorded to a judgment of the courts of a foreign nation, that tribunal has declined to give full faith and credit even to the judgment of the court of a sister state unless "the out-of-state court had jurisdiction over the parties and the subject matter of the controversy." *Trustees of the Sheppard &*

*Enoch Pratt Hospital v. Smith*, 114 R.I. 181, 183, 330 A.2d 804, 805 (1975). *See also Israel v. National Board of Young Men's Christian Association*, 117 R.I. 614, 369 A.2d 646, 650 (1977). Since Rhode Island views the original court's jurisdiction as a proper subject for inquiry even in precincts where 28 U.S.C. § 1738 and the United States Constitution, Art. IV, § 1, hold sway, this court, constrained to assay analogous decisions of the Rhode Island Supreme Court in making its forecast of how the state courts would react to the problem presented, *see Plummer v. Abbott Laboratories*, 568 F.Supp. 920, 921–22 (D.R.I.1983), has scant hesitancy in predicting that Rhode Island would permit at least the same inquiry where, as here, the judgment of a Hong Kong court is implicated. Indeed, that sort of approach appears to represent the majority rule. *E.g., Bank of Montreal*, 430 F.Supp. at 1246 (California law). And, sister state adjudications are an important resource for the federal district courts in vaticinating the law of the forum state. *Murphy v. Erwin-Wasey, Inc.*, 460 F.2d 661, 663 (1st Cir.1972); *Plummer*, 568 F.Supp. at 922.16.

tained no offices, bank accounts, or assets there; it performed no services there; its employees were not present in that venue on H–RI's account; it undertook no solicitation or other significant activity there; it did not seek directly to serve (or to advantage itself of) the Hong Kong market, or to avail itself of the privileges and benefices of Hong Kong law. In brief, it cannot be said that the defendant participated in the economic life of the colony. *See Bond Leather Co. v. Q.T. Shoe Mfg. Co.*, 764 F.2d 928, 933 (1st Cir.1985).

■■■■ Oman makes two (rather feeble) gestures in an effort to deflect this seemingly inevitable conclusion. It argues, first, that H–RI regularly ordered goods on consignment from Hong Kong. And, there is evidence in the record of a few such purchases. Yet, reference to this course of trading is, in this instance, a mere heuristic. The caselaw is consentient that a buyer which does no more than place orders with a foreign merchant and await delivery does not thereby subject itself to suit on the seller's turf. *E.g., Rosenberg Bros. & Co. v. Curtis Brown Co.*, 260 U.S. 516, 518, 43 S.Ct. 170, 171, 67 L.Ed. 372 (1923); *Bond Leather Co.*, at 933–34; *Whittaker Corp. v. United Aircraft Corp.*, 482 F.2d 1079, 1084 (1st Cir.1973). *See generally* Note, *Long Arm Jurisdiction in Commercial Litigation: When Is a Contract a Contact?*, 61 B.U.L.Rev. 375, 386–89 (1981). If a wholly passive purchaser could so easily be snared by the jurisdictional net of the place of origin of the goods, commerce and trade would come to a virtual. standstill. The law is not blind to such realities. As the Court has lately held, "purchases ..., standing alone, are not a sufficient basis for [the] assertion of jurisdiction." *Helicopteros Nacionales de Co-*

*lombia, S.A. v. Hall*, 466 U.S. 408, 104 S.Ct. 1868, 1874, 80 L.Ed.2d 404 (1984).

Oman's remaining exhortation is more nebulous. It seems to contend that, since Wong owned both H–RI and H–NY, and controlled WJP Co. in the bargain, his presence and activities in Hong Kong (and those of his other companies) subjected H–RI to the reach of the colony's courts. That argument is captious. There is absolutely no credible evidence in this record that Wong (or anyone else, for that matter) ever transacted any business in Hong Kong to H–RI's behoof. Commonality of ownership alone neither requires nor adequately platforms a finding of jurisdiction. *See Cannon Manufacturing Co. v. Cudahy Packing Co.*, 267 U.S. 333, 336–37, 45 S.Ct. 250, 251, 69 L.Ed. 634 (1925); *cf. Conn*, 105 R.I. at 405–09, 252 A.2d 184 (residency of corporate shareholders).

■■■ H–RI at no time purposefully availed itself of the benefits of transacting business in Hong Kong. It was not a party to, nor meaningfully implicated in, the specific transactions with Oman. The corporation was but a passive purchaser of goods emanating from the Orient, and the totality of its contacts with and within Hong Kong were purely ancillary to that role. Its brushes with the colony were not of a "continuous and systematic nature." *Hall*, 104 S.Ct. at 1872.[6] There was no rational basis upon which H–RI could have expected to be haled into court on those distant shores. And, it was entirely within its rights in ignoring service of process in the Hong Kong action. *See generally World Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 295–99, 100 S.Ct. 559, 566–68, 62 L.Ed.2d 490 (1980); *Bond Leather Co.*, at

**6.** The sum of the defendant's contacts with Hong Kong strikes this court as considerably less significant than those which were involved in *Hall, supra.* There, a foreign equipment lessor was sued in Texas as a result of the death of four Americans in a helicopter crash in Peru. The defendant, which owned and leased the rotocraft, purchased most of its helicopter fleet from a Texas manufacturer over the course of many years; commissioned pilots and other employees to go to Texas for training; and negotiated a major contract for the leasing of helicopters there. The Court held that the defendant's involvement was insufficient to satisfy requirements of the due process clause and hence to allow a Texas court to assert in personam jurisdiction over the lessor. The teachings of *Hall* have obvious applicability in this case.

933–35 & n. 4; *Glater v. Eli Lilly & Co.,* 744 F.2d 213, 215–17 (1st Cir.1984).[7]

Inasmuch as the Hong Kong court never acquired jurisdiction over H–RI, the foreign judgment cannot be recognized in these proceedings. The "due citation or voluntary appearance which *Hilton, supra,* mandates is entirely lacking here. The principle of international comity is not sufficiently elastic as to stretch to so lengthy an extreme. The respect owed to the judicial pronouncements of a foreign sovereign cannot be held to embrace situations such as this, where the foreign court has arrogated unto itself jurisdiction over an American litigant without any fair basis for so doing. Neighborliness among nations notwithstanding, a party cannot unwillingly be trolled into the territorial waters of a foreign tribunal by means of so fragile a line.

Count I of the plaintiff's second amended complaint is, accordingly, meritless. And, because the Hong Kong court lacked jurisdiction over H–RI, it follows inexorably that the judgment of that tribunal is not entitled to preclusive effect as between these parties, for the defendant did not have a "full and fair opportunity for judicial resolution of the same issue" in the earlier suit. *Fiumara v. Fireman's Fund Insurance Companies,* 746 F.2d 87, 92 (1st Cir.1984). *See also Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation,* 402 U.S. 313, 328–29, 91 S.Ct.

1434, 1442–43, 28 L.Ed.2d 788 (1971); *Hilton,* 159 U.S. at 202, 16 S.Ct. at 158.

### V.

The final arrow in the plaintiff's quiver is double-shafted. Oman makes two interrelated points. Even if H–RI cannot be held liable in its own right as a guarantor or as a judgment debtor, these theses run, the lender can nonetheless reach the defendant's exchequer either because (i) H–RI must logically be seen as a mere continuation of the business of H–NY (and, therefore, responsible for the latter's legitimate debts) and/or (ii) H–RI, H–NY, and WJP Co., or some or all of them, are but the alter ego(s) of each other and of the peripatetic Mr. Wong (a self-admitted guarantor of the indebtedness). Oman has blended these theories together in its case, but the court declines to deal with them ensemble. They are the subject of two separate statements of claim (Counts IV and V, respectively) in the second amended complaint. Moreover, their focus is fundamentally different. The continuation theorem looks, in effect, to expand H–RI's carapace to fit within it the activities of H–NY. The alter ego approach is an attempt to puncture, rather than to swell, the defendant's corporate identity. And, only the first of these constructs can be viewed as a form of successor liability. The court treats initially with that foray, and turns subsequently to the plaintiff's alternate excursion.[8]

**7.** This holding renders it unnecessary for the court to consider H–RI's alternative thesis, viz., that even if the defendant was at one time subject to suit in Hong Kong, it was no longer so amenable by the time that Oman finally served process (November 15, 1983). *See, e.g., Lucini v. Mayhew,* 113 R.I. 641, 324 A.2d 663 (1974).

**8.** The court recognizes, at the threshold, the presence of a series of intricate legal questions. Though the evidence is nowhere near as strong vis-a-vis H–NY (after all, some of the factors cited in Part III hereof as buttressing the conclusion that H–RI did not guarantee the debt of WJP Co. inculpate—rather than absolve—H–NY), this court entertains serious doubt as to whether H–NY was a guarantor of the credit line. That dubiety is heightened by the force of the expert testimony, which undercut the exist-

ence of *any* corporate guaranty. Yet, H–NY has been adjudged liable to Oman in the Hong Kong courts; it has not contested that holding; it chose not to defend itself in the present suit; and too little is known of record for this court to measure H–NY's susceptibility to process in Hong Kong. H–RI seems to argue that it can, in this proceeding, collaterally attack the existence and vitality of H–NY's putative guaranty— but it offers no authority to support that stance. Because this court has concluded that H–NY's liability *vel non* to Oman is, in the final analysis, not determinative of any of the claims lodged against H–RI, *see* text *post,* the court declines further to explore this tangled thicket. Instead, for purposes of Part V hereof, the court assumes arguendo that H–NY was such a guarantor and that the Hong Kong judgment had binding effect against that corporation.

## A.

Liability by succession has been most prominently litigated in the product liability context; an injured plaintiff attempts to hold a viable manufacturer liable in tort for a defect in goods designed and sold by a predecessor in interest. *E.g., Dayton v. Peck, Stow and Wilcox Co.*, 739 F.2d 690 (1st Cir.1984); *Cyr v. B. Offen & Co.*, 501 F.2d 1145 (1st Cir.1974); *Kloberdanz v. Joy Manufacturing Co.*, 288 F.Supp. 817 (D.Colo.1968). In such circumstances, courts have tended to honor the distinctiveness of separate corporate entities except where (i) the successor agreed (expressly or impliedly) to assume the originator's debts, or (ii) there has been a *de facto* consolidation or merger of the two, or (iii) the successor is a mere continuation of the originator, or (iv) the spectre of fraud looms. *Dayton*, 739 F.2d at 692; *Leannais v. Cincinnati, Inc.*, 565 F.2d 437, 439 (7th Cir.1977); *Kloberdanz*, 288 F.Supp. at 820.

These same principles have infused the law of contracts. *See Bishop v. Dura-Lite Manufacturing Co.*, 489 F.2d 710, 711–12 (6th Cir.1973) (per curiam); *Araserv, Inc. v. Bay State Harness Horse Racing and Breeding Association*, 437 F.Supp. 1083, 1089–91 (D.Mass.1977). And, it is of particular relevance, given the fact that this litigation arises under the court's diversity jurisdiction, that Rhode Island has embraced at least some form of the doctrine in contract cases. *See Cranston Dressed Meat Co. v. Packers Outlet Co.*, 57 R.I. 345, 190 A. 29 (1937). There is every reason to believe that Rhode Island, though its caselaw is sparse, would align itself with the mainstream of judicial thought on such issues.

In order to gauge the applicability of this breed of exception to the general rule that a separate and distinct corporation does not, by virtue of lineage, share the liability of another, each case requires scrutiny of its particular factual predicate. *Araserv*, 437 F.Supp. at 1090; *Cranston Dressed Meat*, 57 R.I. at 349, 190 A. 29 ("Whether or not a given transaction amounts to a continuation of an old corporation by means of a new one must be determined by the court in any case after a consideration of the facts and circumstances therein"). In the matter at bar, the lender does not argue that H–RI ever agreed, either expressly or by fair implication, to shoulder the liabilities of H–NY. Rather, Oman urges that the relationship should be viewed as a continuation of the latter's business by the former. It subsumes principles of *de facto* merger within this rubric. And, though the plaintiff does not directly cry "fraud," it hints broadly that such is the case. The court looks, accordingly, to the indicia of continuity in this record.

■■■ In formulating the mix of elements appropriate for consideration on the continuation/merger issue, there are few bright lines to be drawn. Each case is inherently different. But, the caselaw reflects repeated emphasis on identity of ownership and control, continuity of management, adherence to common business plans, sameness of product lines, duplications in staff, facilities, assets, and commercial relationships, and the like. The efforts of a firm to be perceived by its customers and others with whom it cherishes advantageous relations as the same, or as different, and the attempted exploitation of the predecessor's good will (or the absence thereof), may be weighed in the balance. *Cyr*, 501 F.2d 1153–54. The finder of the facts may look to any other factors reasonably indicative of commonality or of distinctiveness. *Cf. Vucci v. Meyers Brothers Parking System, Inc.*, 494 A.2d 530, 534 (R.I.1985) (joint advertising; existence of single pension plan covering employees of both corporations). And, in contract cases, the timing and juxtaposition of conduct and events, as well as the motives underlying them, are critical. *E.g., Bishop*, 489 F.2d at 711; *Cranston Dressed Meats*, 57 R.I. at 347–50, 190 A. 29. The bottom-line question is whether each entity has run its own race, or whether there has been a relay-style passing of the baton from one to the other. The burden of proof rests with

the proponent of the continuation concept. *Dayton,* 739 F.2d at 692.

To be sure, H–NY and H–RI were, in the relevant time frame, under common ownership. But, that fact alone is far from enough to make the lender's case. *Cf. Architectural Building Products, Inc. v. Cupples Products Corp.,* 221 F.Supp. 154, 155 (E.D.Wis.1963). The evidence shows that this suit is only distantly (if at all) related to the prototypical continuation arrangement. First and foremost, H–RI was not formed to take up where H–NY left off. H–RI was organized in 1981; H–NY had then been in existence for some five years. There is not a shred of proof that H–RI was used to siphon off business or profits from H–NY. The two continued to function as distinct operating entities from August of 1981 until at least early 1983. When WJP Co., and shortly thereafter H–NY, were buffeted by economic storms in late 1982 and thereafter, H–RI did not, from aught that appears, change its course in the slightest. There has been no showing that, even after the extent of the debacle was known, H–RI picked up the pieces of H–NY's operation. On this record, the defendant eschewed any attempt to trade on H–NY's preexisting relationships or to avail itself of any residual goodwill. The timing and juxtaposition of events belie the plaintiff's theory of the case.

There was, moreover, a legitimate business purpose underlying the formation of H–RI—and the proof of the prudence of that reasoning is starkly apparent on this record. H–NY's fate was intimately involved with that of WJP Co., and the latter was about to embark on perilous mercantile seas. It made eminently good sense for Wong to avoid putting all of his eggs in a single basket. After all, limitation of liability is a time-honored incentive to the (perfectly lawful) formation of separate corporations for separate business ventures. *See Gartner v. Snyder,* 607 F.2d 582, 586 (2d Cir.1979); *Ramirez v. United States,* 514 F.Supp. 759, 764 (D.P.R.1981). The business of H–RI was started without any use of H–NY funds. And, the object of the enterprise—the raison d'etre for its creation—was a plausible one.[9]

H–NY and H–RI were run as two segregated concerns. (In this regard, the court credits particularly the testimony of Yu Yuet Ming, an impeccable witness whose candor stood out on this scarred terrain.) They maintained offices far removed from each other, and there was no credible evidence that either company ever used the other's facilities. The New York headquarters was not abandoned when the Rhode Island offices were opened. There was no intermingling of corporate funds, no wholesale swapping or shifting of assets. Though the evidence is scanty, there is no credible proof of inventory transfers without due consideration. Each corporation kept its own books and records; each preserved its idiosyncratic corporate identity; each had its own banking arrangements (with dissimilar institutions). Day-to-day management was in different hands.[10] Their respective rosters of employees did not noticeably overlap. H–NY was the parent corporation of WJP Co., *see* text *ante* at Part II, and its dealings were dependent almost entirely on that relationship. (The lender knew this from the start, as witness the sizable intercorporate account receivable spotlighted in the early correspondence between Oman and WJP Co. *See* Exhibit M at ¶ 7(a); Exhibit 7 at

---

9. It should be noted that, when H–RI was established, the linkage which later developed between WJP Co. and Oman was not even a gleam in Wong's eye. He was wholly unaware of the lender's existence until Ho brought WJP Co.'s borrowing needs to the bank's attention some six months thereafter. H–RI cannot be said to have been hatched as part of a prevenient scheme to bilk Oman.

10. Wong was the president of both corporations for a time, but he was plainly uninvolved in the daily operations of either. H–NY was managed by Salem Choi. (Though Choi did assist Wong in the formation of H–RI, and served without compensation as its titular corporate secretary, he never worked for H–RI.) The Rhode Island corporation was run, at various times, by Danny Kwa, Julio DeSouza, and Yu Yuet Ming, none of whom were ever officers or employees of H–NY.

¶ 7a.) H–RI did a modicum of routine business with WJP Co. (and none to speak of with H–NY), but essentially plied its own channels of trade. Its survival to this day (long postdating the domino-style collapse of WJP Co. and, later, H–NY) bears mute testimony to its independence and to the separateness of its course. There was no pooling: at no time did the two firms coalesce or coopt each other's assets. In short, apart from Wong's ownership and dual office-holding, there was no discernible "community of interest," *Cranston Dressed Meat*, 57 R.I. at 350, 190 A. 29, between the two concerns.

Although these general findings are dispositive of the plaintiff's continuation theory, the court has also focussed on certain bits of evidence upon which Oman placed particularly heavy reliance. The first such morsel is the calling card incident. Charloo testified that, early on, Wong gave him a business card which linked WJP Co. to "Hoiyong Gems Corp. U.S.A." and upon the face of which Wong had crossed out the New York address and telephone numbers. Charloo brandished this card, Exhibit 2, as bulwarking his testimony that Wong had told him, in effect, that the "holding company" had recently shifted its headquarters from New York to Providence. This testimony was not creditworthy; the court accepts Wong's statements that he never told Charloo that H–NY had "moved to Rhode Island" and that the emblazonment which by the time of trial had been obliterated on Exhibit 2 was intact and unmarked when Wong presented the card to the lender.

Secondly, the plaintiff stresses that certain corporate tax returns, filed in Rhode Island and New York, respectively (Exhibits 20 and 21), bear out its belief that H–RI absorbed H–NY. (H–RI claims that the exhibits are merely returns filed by it in two different states.) The court has devoted painstaking study to these documents. They are, admittedly, puzzling. Though they can be seen as supportive of the inference suggested by Oman, they do carry identical taxpayer identification numbers, and can be viewed with equal logic as consistent with the defendant's position. The evidence surrounding the origins and etiology of these filings was cryptic. And, the lender had the burden of proof. The court cannot say, on this record, that one interpretation is more compelling than the other. The tax returns, bereft of ancillary evidence, are inadequate to carry the day for Oman.

█ When the full panoply of relevant facts and circumstances is examined dispassionately, it becomes apparent that the evidence is insufficient to establish the lender's claim that H–RI was a mere continuation or extension of H–NY, or that the former *de facto* absorbed the latter. The plaintiff has failed to sustain the devoir of persuasion on this issue. The two corporations were distinct entities, separately run and existing in parallel. H–RI did not materially benefit either from Oman's advances or from the demise of its sister corporation. H–RI and H–NY ran separate races. In the absence of fraud, deception, or subterfuge, *see* text *post* at Part V (B), the successor liability initiative will not wash. The lender cannot recover on Count IV of the second amended complaint.

### B.

The second half of Oman's attempt to impose guilt by association is conceptually dissimilar. This type of issue usually arises in a context where the claimant seeks to pierce the corporate veil and to hold the owners of the entity personally liable for its debt. *E.g., Kirno Hill Corp. v. Holt*, 618 F.2d 982, 985 (2d Cir.1980); *Muirhead v. Fairlawn Enterprise, Inc.*, 72 R.I. 163, 172–73, 48 A.2d 414, 419 (1946); *Vennerbeck & Clase Co. v. Juergens Jewelry Co.*, 53 R.I. 135, 138–39, 164 A. 509, 510 (1933). But here, that effort would perforce be unavailing: it is unquestioned that Wong owned both H–RI and H–NY, and he is not a defendant in this action. The plaintiff must, therefore, rely on a more sophisticated variation on the theme: that H–NY and H–RI were so controlled and operated as to warrant utter disregard

**364**

of their individual corporate personae and, consequently, the cross-imposition of liability. As the Rhode Island Supreme Court has lately held:

> In a circumstance in which two corporations are affiliated through common stock ownership, the separateness of each entity will be respected unless the totality of circumstances surrounding their relationship indicates that one of corporations "is so organized and controlled, and its affairs are so conducted, as to make it merely an instrumentality, agency, conduit, or adjunct of [the other]."

*Vucci*, at 536, quoting *United Transit Co. v. Nunes*, 99 R.I. 501, 508–09, 209 A.2d 215, 219 (1965).

In one incarnation or another, this rule has achieved widespread recognition. *E.g., Pepsi-Cola Metropolitan Bottling Company v. Checkers, Inc.*, 754 F.2d 10, 15 (1st Cir.1985); *Van Dorn Co. v. Future Chemical and Oil Corporation*, 753 F.2d 565, 569–73 (7th Cir.1985); *Talen's Landing, Inc. v. M/V Venture*, 656 F.2d 1157, 1160–61 (5th Cir.1981); *My Bread Baking Co. v. Cumberland Farms, Inc.*, 353 Mass. 614, 233 N.E.2d 748, 752 (1968) (Intercorporate liability exists "when there is a confused intermingling of activity of two or more corporations engaged in a common enterprise with substantial disregard of the separate nature of the corporate entities, or serious ambiguity about the manner and capacity in which the various corporations and their respective representatives are acting," at least in situations where "the plaintiff deserves payment").

Much of the factfinding which has gone before, *e.g.*, text *ante* at Part V(A), is germane on this issue. H–NY and H–RI, though commonly owned, were not manipulated in such a way as to blur the practical distinctions between them. Their affairs were, by and large, conducted separate and apart from each other; each corporation retained its individual identity and personality; their businesses were not managed in such a way as to create a perception that they were one. The "confused intermin-

gling of activity" of which *My Bread Baking Co., supra*, warned was, by and large, absent. Neither entity was guilty of dereliction of corporate formalities. And, this court has found insufficient evidence of ambiguity in their actions and interrelationships to warrant invocation of the doctrine. Objectively viewed, H–NY appears to have stood on its own feet, operating toward its own goals; it was at no time merely a stalking horse for H–RI. Nor was the latter a hollow vessel devoted to doing the bidding of H–NY. The negotiations surrounding the desired guaranty concerned H–NY alone; there is no legitimate basis for Oman's post hoc claim that it was confused or misled as to H–RI's involvement. The record does not support an inference that Wong used these two companies as interchangeable peas, moving one and then the other beneath the shell to suit his fancy and thereby to confound those with whom he dealt.

Furthermore, the better-reasoned cases require a causal link. "The separate corporate identities will be disregarded only if the condition claimed to be unjust to creditors is a result of the abuses of the corporate form." *Van Dorn Co.*, 753 F.2d at 570. In Rhode Island, the caselaw also indicates that some inequity must be made manifest to sanction corporate disregard. *R & B Electric Co. v. Amco Construction Co.*, 471 A.2d 1351, 1354 (R.I.1984); *Ferris v. Hawkins*, 457 A.2d 253, 256 (R.I.1983); *Vennerbeck & Clase Co.*, 53 R.I. at 138–39, 164 A. 509. Such inequity requires judicial intervention only when one or more corporations are used as mere instrumentalities "to defeat public convenience, justify wrong, protect fraud, or defend crime." *Id.* at 139, 164 A. 509. *See also R & B Electric Co.*, 471 A.2d at 1354; *United Transit Co. v. Nunes*, 99 R.I. at 508, 209 A.2d 215.

Nothing of the sort occurred in this case. Wong did not dangle the H–NY guaranty as an inducement to Oman for the loan. To the contrary, he explicitly warned that H–NY's assurance would add nothing to Oman's security; having its guaranty

"would be the same" as having Wong's personal guaranty. *See* Exhibit 7 at ¶ 2. The lender nevertheless affirmatively sought to obtain it. Having done so, the plaintiff failed to take the most rudimentary of banking precautions vis-a-vis the guarantor: it asked for no warrantees, it reviewed no financial statements, it casually abandoned its original request for audited balance sheets, it eschewed corporate certificates, it did not seek to collateralize the assurance. Oman simply took Wong at his word that H–NY was a holding company which owned substantially all of the stock of the borrower (WJP Co.). Indeed, H–NY possessed—and still retains—this stock ownership. The lender received exactly what it bargained for. H–RI was there to be found, functioning visibly and in place, had Oman asked the questions of Wong, WJP Co., and/or H–NY that a reasonably prudent banker would likely have essayed.

There was no amphiboly about the capacity in which Wong acted: insofar as negotiations anent the corporate guaranty were concerned, he presented himself to Oman strictly and solely as the owner/president of "the holding company," *i.e.,* H–NY. The lender was not in any actionable way misled or deceived, nor was its ensuing loss brought about by misrepresentation or other unconscionable behavior on Wong's part. He may well have been guilty of an overly optimistic assessment of WJP Co.'s future; but, if such rose-colored glasses were outlawed in the world of high finance, few venture capital loans would ever be closed. And Oman, having neglected to make a thorough independent evaluation of either WJP Co.'s prospects or H–NY's stability,

can scarcely be heard to complain of such rodomontade at this juncture.

What is more, there is not an iota of proof that H–RI benefitted in the slightest from the transaction.[11] The plaintiff has not proven that any of its funds inured, directly or indirectly, to H–RI's advantage, or that the Rhode Island firm was enriched in any respect by the largesse which Oman extended to WJP Co. or by the lender's reliance on the Hoiyong guaranty.

Nor is fraud legitimately at issue here. In the first place, there was none: at most, Oman was entitled to precisely what it got —H–NY's guaranty. *But see* n. 8 *ante.* There is no credible evidence that H–RI (or H–NY, for that matter) practiced any subterfuge, or dealt with the lender in an underhanded fashion.[12] There is nothing to show that either WJP Co. or H–NY was purposefully drained, or that H–RI siphoned off the excess cash or assets of either. To be sure, Oman was left holding an empty bag, but that result was a predictable consequence of its precipitate acceptance of a largely uninvestigated business risk. Commercial lenders are in the business of risk-taking, and must bear the brunt thereof in the absence of deceptive practices or other special circumstances. If a financier fails to do its homework and guesses wrong, its gaze in fixing the blame must be inner-directed. The public interest would be disserved by honoring the plaintiff's attempt to forego responsibility for its own ill-considered acts by shifting the burden to an essentially uninvolved party.

The lender has wholly failed to demonstrate wrongdoing on the part of H–RI or on the part of any agency for which it should be held accountable. H–RI's business was conducted in conformance with

**11.** The court acknowledges that H–RI may have received certain goods on consignment from WJP Co., and that Oman may have financed WJP Co. in regard to such shipments. But, there was no proof that H–RI failed to fulfill its payment terms with WJP Co. according to the tenor thereof.

**12.** The plaintiff offered some evidence from which it sought to have the court conclude that H–RI was obligated to return gems previously

purchased from WJP Co. to Oman, and transmitted opal shavings instead. The court declines to draw the suggested inference. The lender's thesis in this respect is inherently speculative. In the court's view, there is nothing of substance to show that, if opal shavings were indeed contained in the carton and if the carton was indeed transshipped by H–RI, the contents were any different than what H–RI actually received.

the requirements of law. Neither the defendant, nor H–NY, nor WJP Co., was a sham entity.[13] There was no unity of interest between H–RI and any other firm in the transactions with Oman; to the contrary, H–RI was privy to *no* dealings with Oman, and it would be inequitable to hold H–RI hostage for losses which stemmed principally from the lender's negligence and lack of attention to detail.

In sum, Oman has proved little more than that Wong controlled all of the companies. And, it is settled beyond peradventure that "[t]he mere fact that ... two corporations were owned and operated by the same ... individual [ ], without more, is not sufficient to justify a disregard of corporate identities." *Custer Builders, Inc. v. Quaker Heritage, Inc.*, 41 A.D.2d 448, 451, 344 N.Y.S.2d 606, 609 (1973), quoted with approval in *R & B Electric Co.*, 471 A.2d at 1354–55. *Cf. Stratford Credit Corp. v. Berman*, 73 R.I. 247, 252, 54 A.2d 404, 407 (1947) ("The mere fact that a person holds an office in two corporations that may be dealing with each other ... is not enough to make them identical in contemplation of law."). Apart from the admitted fact of common control, the credible proof boils down to this: Oman knew that the business destinies of WJP Co. and of its parent were inextricably intertwined; it sought—and presumably received—the guaranty of the parent; it made no inquiry into the availability of additional security or the existence *vel non* of other corporate affiliates.[14] Wong made no material misrepresentations to Oman (though it can be argued persuasively that Oman failed to ask the questions which should logically have sprung to mind). Having staked the repayment of its loan on the combined fate of the borrower and its holding company, it comes with remarkable ill grace for the lender to attempt to squeeze out of its self-constructed bind by asking the court belatedly to rewrite its credit assurances.

The fact that Wong was the owner of both H–RI and H–NY, and the control person in WJP Co. to boot, does not, on this record (without any probative evidence of fraud, deceit, unjust enrichment, or other wrongdoing) furnish any basis for holding the defendant guilty by reason of its associations. *See R & B Electric Co., supra; Alterio v. Biltmore Construction Corp.*, 119 R.I. 307, 315–16, 377 A.2d 237, 241 (1977). Any other result would destroy the vitality of the independence of distinct corporations, and would plunge the world of commerce into a special sort of chaos. Count V of the second amended complaint must, therefore, be dismissed.

## VI.

Although Oman has spread arguments on the record with both the ubiquity and variety of graffiti in a subway, the facts of this matter do not paint a picture upon which the plaintiff should be allowed to prevail. Certainly, the evidence may be viewed as giving rise to conflicting speculations. But, the proponent of a proposition must prove more than arguably suspicious circumstances. The court concludes that H–RI was not shown to be a guarantor of the liability of WJP Co., that the lender's foreign default judgment is unenforceable against H–RI in these proceedings, and that there is no legally sufficient basis to hold the defendant liable by virtue of its associations. Oman has fallen short of proving that H–RI was a mere continuation or extension of H–NY, or that there was a *de facto* merger of the two. The totality of the circumstances fails cogently to indicate that either corporation was so structured, used, and/or operated as to make it a mere

13. Oman never proved that there was any inaccuracy in the representations made by Wong and Ho that, at the time of the credit transaction, WJP Co. had 350–400 employees and was doing a sales volume in excess of HK$6,000,000 monthly. *See* text *ante* at Part I.

14. Oman, to be sure, may have been lulled into a sense of overconfidence by the fact that it held Wong's personal guaranty of the loan, and believed Wong to have a personal net worth of $50,000,000. *E.g.*, Exhibit 7 at ¶ 1(c). But, the lender never attempted to show that this representation was inaccurate when made.

instrumentality or conduit of the other. Accordingly, the plaintiff's second amended complaint, insofar as it seeks to implicate H–RI, is denied and dismissed with prejudice. There being no just cause for delay, the clerk is directed to enter judgment in favor of Hoiyong Gems Corporation for costs.

*It is so ordered.*