**UNITED STATES of America**

v.

**Richard MOTTOLO, et al.**

**STATE OF NEW HAMPSHIRE**

v.

**Richard MOTTOLO, et al.**

**Civ. Nos. 83–547–D, 84–90–D.**

United States District Court,
D. New Hampshire.

Aug. 29, 1988.

U.S. Atty. by Susan L. Howard, Asst. U.S. Atty., Concord, N.H., F. Henry Habicht, II, Action Asst. Atty. Gen., Elizabeth Yu, Andrew S. Hogeland, Atty. Environmental Enforcement Section Land and Natural Resources Div. U.S. Dept. of Justice, Washington, D.C., Lynn Peterson, Office of Regional Counsel, U.S. E.P.A., Boston, Mass., for U.S.

Engel & Morse, P.A. by Lynn D. Morse, Exeter, N.H., for Richard Mottolo and Service Pumping & Drain Co.

Stark & Peltonen, P.A. by Rodney L. Stark, Manchester, N.H., for K.J. Quinn & Co.

Sheehan, Phinney, Bass & Green, P.A. by James E. Higgins, and Claudia C. Damon, Manchester, N.H., for Lewis Chemical Corp. and Carl Sutera.

Attorney General's Office by Peter G. Beeson, Environmental Protection Div., Concord, N.H., for State of N.H.

Carl Sutera, Lewis Chemical Corp., Boston, Mass., pro se.

## ORDER

DEVINE, Chief Judge.

Plaintiffs United States of America, on behalf of the United States Environmental Protection Agency ("EPA"), and the State of New Hampshire bring these consolidated civil actions pursuant to the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), 42 U.S.C. §§ 9601–9675, *amended by* the Superfund Amendments and Reauthorization Act of 1986 ("SARA"), Pub.L.No. 99–499, 100 Stat. 1613 (1986), and New Hampshire state law. Plaintiffs seek reimbursement of costs they incurred in cleaning up a hazardous waste dump in Raymond, New Hampshire. Plaintiffs seek recovery from defendants Service Pumping and Drain Co., Inc. ("Service"), a Massachusetts corporation; Richard Mottolo, owner of the land on which the dump was located ("the Mottolo site"), and president, treasurer, and owner of Service; K.J. Quinn and Company, Inc. ("Quinn"), a Delaware corporation; Lewis Chemical Company ("Lewis"), a Massachusetts corporation; and Carl Sutera, president and principal shareholder of Lewis. The Court's jurisdiction is based on 28 U.S.C. § 1345 and 42 U.S.C. § 9613(b).

By way of a joint motion, the United States and New Hampshire move for partial summary judgment against all defendants. Defendants object. All parties have filed multitudinous memoranda, exhibits, affidavits, transcripts of deposition testimony, and other documents to support their respective positions; accordingly, the Court finds a hearing to be unnecessary and rules on the documents as filed.[1] *See* Rule 11(g), Rules of the United States District Court for the District of New Hampshire.

### Factual Background and Prior Proceedings

The Mottolo site was first reported to authorities by an off-duty local police officer who discovered the site while hunting. Subsequent on-site investigation by the State of New Hampshire revealed a dump in which a large number of drums and pails of liquid waste had been compacted by bulldozers or other earthmoving equipment and partially buried. Based on the physical characteristics of the drums, the strong solvent smell emanating from the area, bright multi-colored liquids visibly leaking from the containers, and an upswelling of groundwater in several locations between the site and a creek downhill with odor and color consistent with the leachate, the investigators concluded that the drums probably contained hazardous materials which

---

1. The separate memoranda filed by individual plaintiffs and defendants at times raise different issues or present different arguments than those of their co-litigants. The Court treats individual arguments which apply to and benefit all plaintiffs or all defendants as having been presented and argued by plaintiffs or defendants as a group.

most likely were leaching into the environment.

The State undertook further investigation, including taking and analyzing surface and groundwater samples, installing groundwater monitoring wells, and ordering engineering and geohydrological studies. This investigation confirmed: (1) that chemical wastes were leaching from the partially-buried drums and other containers into the soil and that the soil was atop a groundwater aquifer which supplied water to neighboring private wells, and (2) that the leaching wastes were also contaminating ground and surface waters draining into the creek, which in turn fed the Exeter River, a public drinking-water supply.

In the spring of 1980, the State asked EPA to conduct drum removal activities at the site. The removal process, which lasted approximately from September 1980 to February 1982 and included excavating and temporarily storing the drums, confirmed that containers at the site had been thrown haphazardly atop each other among boulders, that the majority of the containers were crushed, punctured, corroded, and disfigured, and that many were leaking. EPA determined that the improper manner of the containers' disposal, the haphazard comingling of chemicals, and the accessibility of the site not only created a hazard to ground and surface water, but also posed a risk of fire, explosion, vapor release, and possible inhalation or dermal contact.

EPA ultimately recovered more than 1,650 drums and other, smaller containers, all of which held or had held numerous toxic, flammable, corrosive, irritant, and explosive materials. EPA also conducted site security and maintenance activities and was responsible for the removal and disposal of the drums and their contents and more than 160 tons of accompanying contaminated soil and debris to off-site waste facilities. Prior to and during the removal process, EPA sampled and analyzed on-site groundwater and the contaminated materials which had been removed from the site.

Investigation disclosed that the dump site was owned by Richard Mottolo, who had bought the property in 1964. In 1973

Mottolo purchased Service, a company whose primary business was cleaning drains, septic tanks, and grease traps. In 1975 and thereafter, although neither Mottolo nor Service was licensed to haul hazardous waste, Service contracted to dispose of chemical wastes generated by Quinn and Lewis. This waste was dumped at the Mottolo site. Mottolo ran Service as a sole proprietorship until 1980, at which time he incorporated the company.

Litigation commenced in this court on September 8, 1983, when the United States brought suit pursuant to CERCLA to recover EPA's response costs from Mottolo, Service, Quinn, Lewis, and Sutera. On February 3, 1984, the State of New Hampshire filed a separate action against Mottolo, Quinn, Lewis, and Sutera (but not Service) under CERCLA as well as state law. The two cases were consolidated in January 1985. In its consolidation order, the Court allowed consolidation only of the CERCLA claims and ruled that state claims would be addressed in the ordinary course of the Court's docket. *See* Status/Pretrial Order of January 15, 1985, at 3; *United States v. Mottolo*, 605 F.Supp. 898, 912 (D.N.H.1985).

Respectively, on May 8 and 17, 1985, the United States and New Hampshire moved to amend their complaints to include requests for declaratory judgments, therein seeking to hold defendants liable for future response costs incurred at the Mottolo site. On July 18, 1985, the Court granted the motions; however, in seeking to avoid what it characterized as "claim-splitting" and successive actions for additional damages, the Court conditioned its grant on reopening of discovery and postponement of trial "until such time as plaintiffs present a final and specific *ad damnum* covering all CERCLA damages which plaintiffs seek to recover from defendants...." *United States v. Mottolo*, 107 F.R.D. 267, 268 (D.N.H.1985).

On May 1, 1986, the United States moved for partial summary judgment against some of the defendants. On July 9, 1986, New Hampshire joined in the motion, incorporating by reference the motion of the

United States. *See* Rule 10(c), Fed.R.Civ.P. On May 5, 1987, again stressing a desire to avoid duplicative litigation, the Court denied the motions on the basis that summary judgment had not been sought as to all defendants. On September 30, 1987, plaintiffs responded by filing the instant joint motion for partial summary judgment against *all* defendants. All defendants having filed their objections, the motion is ripe for resolution.

## Discussion

Plaintiffs' motion for summary judgment raises three categories of issues: first, the appropriateness of the use of summary judgment to resolve some of the issues in this litigation prior to trial; second, the extent of defendants' liability; and third, plaintiffs' damages. Discussion of these issues follows.

The Appropriateness of Summary Judgment

Defendants argue that summary judgment may not be granted on fewer than all of the issues or against fewer than all of the defendants in light of previous orders rejecting claim splitting. Defendants also argue that summary judgment is precluded because witness credibility is at issue regarding material facts.

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c), Fed.R.Civ.P. In resolving whether summary judgment is appropriate, a dispute of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and "material" if it "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The moving party has the burden to establish the lack of a genuine, material, factual issue, *Finn v. Consolidated Rail Corp.,* 782 F.2d 13, 15 (1st Cir.1986) (quoting *Pignons S.A. de Mecanique v. Polaroid Corp.,* 657 F.2d 482, 486

(1st Cir.1981)), and the Court must view the record in the light most favorable to the nonmovant, according the nonmovant all beneficial inferences discernable from the evidence, *Oliver v. Digital Equip. Corp.,* 846 F.2d 103, 105 (1st Cir.1988).

■ Summary judgment is routinely applied to resolve legal issues in CERCLA cases. *See, e.g., New York v. Shore Realty Corp.,* 759 F.2d 1032 (2d Cir.1985); *United States v. Bliss,* 667 F.Supp. 1298, 1308–09 (E.D.Mo.1987). Partial summary judgment may be used to adjudicate some, but not all, issues pertaining to liability; *see, e.g., United States v. Conservation Chem. Co.,* 619 F.Supp. 162, 175–77 (W.D.Mo.1985), and the liability of some, but not all, defendants, *see, e.g., Bliss, supra,* 667 F.Supp. at 1302 n. 1, 1314. And summary judgment may be rendered as to liability even if there is a genuine issue as to appropriate damages. Rule 56(c), Fed.R.Civ.P.; *see also generally* J. Moore & J. Wicker, 6—Part 2 *Moore's Federal Practice* §§ 56.- 20[1], 56.20[3.—2] to [3.—3] (2d ed. 1988).

The complexity of litigation poses no obstacle to the use of summary judgment. As noted in *Bliss,* "Rule 56 itself creates no exception for complex cases, and the Supreme Court has upheld summary judgment in the most convoluted litigation." *Bliss, supra,* 667 F.Supp. at 1308 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 576–77, 106 S.Ct. 1348, 1351, 89 L.Ed.2d 538 (1986)). Moreover, employing summary judgment to eliminate issues which need not be adjudicated at trial does not contravene the Court's proscription of claim splitting and duplicative litigation. Because all defendants have been named in the instant motion and have therefore been afforded an opportunity to respond to the issues and arguments raised by plaintiffs, adjudication is binding on all parties and is not subject to relitigation.

As to issues of witness credibility, this Court is well aware that demeanor on the stand and credibility under cross-examination may affect the weight to be given a witness's statements, and therefore, in some circumstances, pretrial deposition evi-

dence may not provide an adequate basis for summary judgment. *See New Hampshire Auto. Dealers Ass'n, Inc. v. GM*, 801 F.2d 528, 535 (1st Cir.1986), *aff'g in part and vacating and remanding in part* 620 F.Supp. 1150 (D.N.H.1985). Nevertheless, a nonmovant may not succeed simply by making bare allegations or by impugning the credibility of the opponent's testimony. If a motion for summary judgment is properly supported, the burden of proof shifts to the nonmovant to set forth specific facts (i.e., to produce affirmative evidence) to demonstrate the existence of a genuine issue for trial. *Anderson v. Liberty Lobby, Inc., supra*, 477 U.S. at 248–51, 106 S.Ct. at 2510–11; *Oliver v. Digital Equip. Corp., supra*, 846 F.2d at 105; *cf. Stepanischen v. Merchants Despatch Transp. Corp.*, 722 F.2d 922, 928–29 (1st Cir.1983) (presence of issues involving state of mind, intent, or motivation does not automatically preclude summary judgment—there must be some indication that evidence will be produced which will enable claimant to reach jury with claim). As the First Circuit has noted: "Were the rule otherwise, any plaintiff could prove any case in the world simply by calling his opponent and getting him to deny it, and then arguing that he was a liar." *Herrick & Smith v. NLRB*, 802 F.2d 565, 568 (1st Cir.1986).

In sum, adjudication of this controversy by way of summary judgment will limit the future scope of this litigation by resolving or reducing currently disputed legal and factual issues. This in turn will promote the efficient utilization of the parties' and the Court's resources. *See* Rule 1, Fed.R. Civ.P. The Court therefore finds and rules that the use of summary judgment is appropriate at this juncture.

Defendants' Liability

The parties contest several issues pertaining to defendants' liability, here addressed individually.

*1. CERCLA Retroactivity*

█ Although cleanup operations at the Mottolo site began approximately in September 1980, CERCLA was not enacted until several months later, on December 11, 1980. The United States alleges that it expended more than $200,000 for response costs at the Mottolo site during this interim period, and it seeks to recover these expenditures from defendants pursuant to CERCLA. Defendants contend that they are not liable under CERCLA for these response costs because the costs were incurred prior to CERCLA's enactment or resulted from acts which transpired before such date. Defendants further argue that, to be recoverable under CERCLA, pre-CERCLA expenditures must have been appropriate under the legislative authority pursuant to which they were made, in this case, section 311(k) of the Clean Water Act ("CWA"), 33 U.S.C. § 1321(k).

Generally speaking, a statute will not be construed as having retroactive effect "unless such be 'the unequivocal and inflexible import of the terms, and the manifest intention of the legislature.'" *United States v. Security Indus. Bank*, 459 U.S. 70, 79, 103 S.Ct. 407, 413, 74 L.Ed.2d 235 (1982) (quoting *United States Fidelity & Guar. Co. v. United States ex rel. Struthers Wells Co.*, 209 U.S. 306, 314, 28 S.Ct. 537, 539, 52 L.Ed. 804 (1908)); N. Singer, 2 *Sutherland Statutory Construction* § 41.04, at 348 (Sands 4th ed. 1986). Nonetheless, looking to CERCLA's legislative history and the Act's failure to explicitly limit recovery of response costs to prospective violations, numerous courts have held that Congress intended CERCLA's provisions to be applied retroactively. *See, e.g., United States v. Shell Oil Co.*, 605 F.Supp. 1064, 1079 (D.Colo.1985); *United States v. Northeast Pharm. & Chem. Co.* [hereinafter *"NEPACCO"*], 579 F.Supp. 823, 840–41 (W.D.Mo.1984), *aff'd in part and rev'd in part on other grounds*, 810 F.2d 726 (8th Cir.1986), *cert. denied*, ——— U.S. ———, 108 S.Ct. 146, 98 L.Ed.2d 102 (1987); *State of Ohio ex rel. Brown v. Georgeoff*, 562 F.Supp. 1300, 1314 (N.D.Ohio 1983). Courts which have addressed the issue of whether retroactive application of CERCLA to pre-CERCLA conduct is constitutional have found that retroactive application of CERCLA does not offend due process. *See, e.g., O'Neil v. Picillo*, 682 F.Supp. 706, 729 (D.R.I.1988) (and citations therein);

*United States v. Otatti & Goss, Inc.*, 630 F.Supp. 1361, 1397–99 (D.N.H.1985).[2]

The expressed goals of CERCLA are to provide the federal government "the tools necessary for a prompt and effective response to the problems of national magnitude resulting from hazardous waste disposal" and to ensure "that those responsible for problems caused by the disposal of chemical poisons bear the costs and responsibility for remedying the harmful conditions they created." *Dedham Water Co. v. Cumberland Farms Dairy, Inc.*, 805 F.2d 1074, 1081 (1st Cir.1986) (quoting *United States v. Reilly Tar & Chem. Corp.*, 546 F.Supp. 1100, 1112 (D.Minn. 1982)). To achieve these remedial goals and avoid frustration of CERCLA's beneficial legislative purposes, thereby protecting and preserving public health and the environment as Congress intended, courts are "obligated to construe [CERCLA's] provisions liberally." *Id.; cf. New York v. Shore Realty Corp., supra*, 759 F.2d at 1045 ("We will not interpret Section 9607(a) in any way that apparently frustrates the statute's goals, in the absence of a specific congressional intention otherwise."). Given this counsel, CERCLA's legislative history and express provisions, and the clear trend of the vast majority of recent caselaw and commentary, the Court is persuaded that CERCLA has retroactive application without limitation to postenactment expenditures. *See, e.g., O'Neil, supra*, 682 F.Supp. at 729 (and citations therein); *United States v. Ward*, 618 F.Supp. 884, 898–99 (E.D.N.C.1985); *Shell Oil Co., supra*, 605 F.Supp. at 1068–79; *Developments in the Law—Toxic Waste Litiga-tion*, 99 Harv.L.Rev. 1458, 1539–42, 1555–62 (1986); Blaymore, *Retroactive Application of Superfund: Can Old Dogs Be Taught New Tricks?*, 12 B.C.Envtl.Aff.L. Rev. 1, 4, 49–50 (1985).

Accordingly, should defendants' CERCLA liability be established, it will extend to response costs which (1) were incurred prior to enactment of CERCLA on December 11, 1980, or (2) resulted from acts that transpired before such date.

In light of this holding, defendants' argument that plaintiffs may not recover pre-CERCLA expenditures unless such expenditures complied with applicable CWA provisions is irrelevant and will not be addressed. Additionally, the Court need not address defendants' argument that pre-CERCLA expenses are unrecoverable because plaintiffs' negligent planning and handling of the cleanup was responsible both for the length of time it took to clean up the site and for expenses being incurred after December 11, 1980. These contentions go to the amount of pre-CERCLA response costs plaintiffs may recover, not to whether such costs are recoverable at all. Quinn's defensive counterclaim against New Hampshire, the viability of which the Court has already recognized adequately, addresses the issue. *See United States v. Mottolo, supra*, 605 F.Supp. at 910–11.

### 2. The Elements of CERCLA Liability

#### a. The Mottolo Site is a Facility

■ As defined by CERCLA, a "facility" is essentially any site where a hazardous substance is located. *See, e.g., Bliss, supra*, 667 F.Supp. at 1305.[3] The term "haz-

---

**2.** The Court is cognizant that two district courts have limited the scope of retroactivity by holding that liability under CERCLA is limited to costs incurred after CERCLA's enactment date. *See United States v. Wade*, 14 Envtl.L.Rep. (Envtl.L.Inst.) [hereinafter "ELR"] 20437, 20437–38, 20 Env't Rep.Cas. 1850, 1850–53 (BNA) [hereinafter "ERC"] (E.D.Pa. Mar. 22, 1984); *NEPACCO, supra*, 579 F.Supp. at 841–43. However, that portion of the *NEPACCO* district court decision which concerns CERCLA's retroactive application to preenactment costs has been reversed, the Eighth Circuit Court of Appeals holding that CERCLA authorizes recovery of response costs incurred prior to December 11, 1980, *NEPACCO, supra*, 810 F.2d at 737, and all recent decisions have declined to follow the retroactivity portion of the *Wade* decision.

**3.** CERCLA defines "facility" as

any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft, or ... any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located....

42 U.S.C. § 9601(9).

ardous substance" is defined in 42 U.S.C. § 9601(14), and numerous hazardous substances have been listed or described in 40 C.F.R. Part 261 (1987) and its appendices.

Chemical wastes found at the Mottolo site by EPA included substances listed in 40 C.F.R. Part 261 as being hazardous: *inter alia*, acetone, toluene, trichloroethylene, xylene, butyl acetate, methanol, methylene chloride, methyl methacrylate, methyl ethyl ketone, and methyl isobutyl ketone. Because hazardous substances were deposited at the Mottolo site, it is a "facility" within the meaning of CERCLA.

**b. Releases and Threatened Releases Occurred at the Site**

■ CERCLA defines "release" as "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment" of a hazardous substance. 42 U.S.C. § 9601(22). "Environment" is defined as "surface water, ground water, drinking water supply, land surface or subsurface strata, or ambient air." *Id.* § 9601(8).

The contents of at least two tanktrucks of hazardous chemicals were discharged directly onto the Mottolo site's surface, and numerous corroded and leaking containers at the site contained hazardous materials. Investigating EPA field personnel found that the site's soil, surface water, and groundwater had been contaminated by hazardous substance discharges. Such conditions constitute "releases" and "threatened releases" within the meaning of CERCLA. *See, e.g., New York v. Shore Realty Corp., supra*, 759 F.2d at 1045.

Defendants argue that plaintiffs have failed to establish the existence of threatened releases because plaintiffs lack evidence of off-site pollution. There is no such requirement in the Act; moreover, the corollary to defendants' proposition is that polluting one's own property *is* acceptable. This contention is both unrealistic and untenable. *See United States v. String-*

*fellow*, No. CV 83–2501 (JMI) (Mx), slip op. at 20–21, 27–28 (C.D.Cal.Sept. 23, 1986) (Special Master's Report) ("flies in the face of all reason").

**c. Plaintiffs Incurred Response Costs**

It is undisputed that the United States and New Hampshire have incurred and face future response costs as a result of the actual and threatened releases at the Mottolo site.

**d. Defendants are Potentially Responsible Parties**

Plaintiffs must show that each defendant falls within at least one of the four classes of potentially responsible parties described in the Act. These include: the owner or operator of the facility; the owner or operator at the time the hazardous materials were disposed of at the facility; any person who arranged by contract, agreement, or otherwise for disposal, treatment, or transport of the hazardous substances; and any person who accepts or accepted such substances for transport to a facility which that person selected. 42 U.S.C. § 9607(a)(1)–(a)(4).

*i. Mottolo*

Mottolo purchased the Mottolo site in 1964 and owned the site at the time the instant suit was commenced. Mottolo is therefore liable as a site owner. 42 U.S.C. § 9607(a)(1). Mottolo also admits that he owned the property at the time hazardous materials were deposited there, and that Service, which at that time was not incorporated, operated the facility. Service is thus liable as a site operator, 42 U.S.C. § 9607(a)(2); *New York v. Shore Realty Corp., supra*, 759 F.2d at 1043–45, and whereas the owner of a sole proprietorship is personally liable for tort liabilities incurred by the proprietorship, H. Henn & J. Alexander, *Laws of Corporations and Other Business Enterprises* § 18, at 58 (West Pub.3d ed. 1983), Mottolo is also liable as a site operator in his capacity as owner of Service.[4]

---

**4.** Prior to Service's 1980 incorporation, Mottolo transported and arranged for the transportation of numerous containers and at least two tank trucks of hazardous waste materials to the Mot-

tolo site on behalf of Service, either driving the truck himself or having a Service employee drive. Mottolo, acting on behalf of Service, also personally chose the Mottolo site as the reposi-

### ii. Service, Inc.

■ Mottolo admits that he incorporated Service in 1980 to escape potential personal liability by using the corporate entity as a shield. Given the circumstances herein, however, Service's phoenixity provides Mottolo no haven from liability.

Although the corporate entity is generally recognized for most purposes, it may not be employed to avoid overriding federal legislative policies, and federal courts will disregard it if the interests of public convenience, fairness, and equity so demand. *Alman v. Danin*, 801 F.2d 1, 3 (1st Cir. 1986); *cf. New Hampshire Wholesale Beverage Ass'n, v. New Hampshire State Liquor Comm'n*, 100 N.H. 5, 7, 116 A.2d 885, 886 (1955) (fiction that corporation is entity independent of stockholders is not favored in New Hampshire and disregarded "when justice demands it"). In applying this rule with respect to federal statutes, the Court looks closely " 'at the purpose of the federal statute to determine whether the statute places importance on the corporate form, an inquiry that usually gives less respect to the corporate form than does the strict common law alter ego doctrine....' " *Alman, supra*, 801 F.2d at 3 (quoting *Town of Brookline v. Gorsuch*, 667 F.2d 215, 221 (1st Cir.1981)).

As stated above, one of CERCLA's expressed goals is to ensure "that those responsible for problems caused by the disposal of chemical poisons bear the costs and responsibility for remedying the harmful conditions they created." *Dedham Water Co., supra*, 805 F.2d at 1081 (quoting *Reilly Tar & Chem. Corp., supra*, 546 F.Supp. at 1112). This goal would be frustrated if the mere act of incorporation were allowed to impede the recovery of response costs, for a nonincorporated violator could avoid liability simply by changing company structure. Furthermore, the absence of explicit statutory language addressing the effect of incorporation, the Act's strict liability scheme, and the broad and encompassing categories of potentially responsible parties ineluctably lead the Court to the conclusion that CERCLA places no importance on the corporate form.

Even under the more rigorous standard imposed by the common law alter ego doctrine, *see Alman, supra*, Service may not escape liabilities incurred by its unincorporated predecessor. A finding that two businesses are alter egos is proper if there is a "substantial identity in terms of corporate ownership, management, business purpose, operation, equipment, customers, and supervision." *Greater Kansas City Laborers Pension Fund v. Thummel*, 738 F.2d 926, 929 (8th Cir.1984) (and citations therein). Continuity of the work force is also relevant. *Id.* Here, all of these factors are present.

After incorporation, Mottolo remained as general manager. No outsiders acquired management responsibilities or proprietary rights, and Mottolo and his wife remained as sole owners of the business, owning one hundred percent of Service's stock. Substantially all of Service's assets were transferred to the new entity. The business made no personnel changes. Existing accounts were serviced in the same manner, using the same equipment, and operating out of the same truck transfer station. Even the name of the new corporate entity was deliberately chosen to be similar to the old so that goodwill generated by customer identification of the company name would continue.

In sum, the expressed beneficial legislative goals underlying CERCLA, the derogation of those goals which would result were the Court to place significance on Service's incorporation, and the identity of ownership and modality of operation between the old and the new business entities provide ample basis for the Court to hold as a matter of law that the difference in legal entities may be here disregarded insofar as CERCLA § 107 liability is concerned.[5] *See generally* Comment, *Dissolv-*

---

tory for his dubious treasures. Mottolo is also therefore liable as a transporter of hazardous substances, 42 U.S.C. § 9607(a)(3), and as one who accepts hazardous substances for transport to a facility or site selected by that person, 42 U.S.C. § 9607(a)(4).

**5.** Plaintiffs raise neither veil piercing nor the alter ego doctrine in contending that Service is

*ing the Corporate Veil: Corporate Officer Liability for Response Costs Under [CERCLA]*, 17 U.Tol.L.Rev. 923 (Summer 1986).

#### iii. Quinn

■ Plaintiffs allege that Quinn is liable because it generated hazardous wastes found at the Mottolo site.

Generator liability requires proof of four elements: (1) that the generator disposed of a hazardous substance; (2) that the generator's hazardous substance or a hazardous substance of the same kind was present at the site at the time it was discovered; (3) that there was a release or threatened release of the generator's or any other hazardous substance at the site; and (4) that the release or threatened release caused response costs to be incurred. 42 U.S.C. § 9607(a)(3); *see also, e.g., Violet v. Picillo*, 648 F.Supp. 1283, 1289 (D.R.I.1986) (citing, *e.g., United States v. South Carolina Recycling & Disposal, Inc.* [hereinafter *SCRDI*], 20 ERC 1753, 1756, 14 ELR 20272, 20274 (D.S.C.1984)). In light of the Court's above holding that releases and threatened releases at the Mottolo site caused plaintiffs to incur response costs, discussion here need only concern, and therefore is limited to, the first two elements.

From 1975 to 1979, Quinn disposed of the vast majority of its chemical wastes by giving it to Service for off-premises disposal, paying Service varying disposal fees depending upon the nature of the waste. Quinn admits that its wastes contained hazardous substances. Mottolo attests that Service transported waste from Quinn's Malden, Massachusetts, and Seabrook, New Hampshire, plants to the Mottolo site.[6] Chemicals of the same type Quinn disposed of and containers with Quinn's name stenciled on them were found at the site.

In sum, plaintiffs have established Quinn's disposal of hazardous substances, Service's acceptance thereof, and an identifying connection between those substances and hazardous substances found at the Mottolo site. This suffices to establish Quinn's potential liability under CERCLA § 107 as a generator.

#### iv. Lewis and Sutera

Although Lewis and Sutera are named in the instant joint motion and have thus had an opportunity to address the legal issues raised by plaintiffs, plaintiffs have not met their burden of showing that there are no factual issues in dispute as to Lewis's and Sutera's liability. Accordingly, the issue of their liability remains for trial.

#### 3. Defenses to Liability

Defendants raise several third-party and equitable defenses to their potential liability.

■ First, Quinn asserts that a genuine issue of material fact exists as to whether the release or threatened release of hazardous substances at the Mottolo site was caused in whole or in part by New Hampshire's and EPA's allegedly negligent supervision of cleanup operations. Quinn argues that this premise, if proved at trial, constitutes a valid third-party defense under CERCLA § 107(b)(3). Section 107(b)(3) provides that parties otherwise liable under section 107(a) are not liable if the release or threat of a release was caused by the act or omission of a third party which is neither an agent of nor contractually related to the

---

liable for Mottolo's and Service's liabilities, but instead focus their attention on the doctrine of corporate successor liability. Because that doctrine applies only if assets have been transferred from one *already existing* corporate entity to another, it is inapplicable here. Even so, were the infusion of assets into Service considered a transfer of assets from the predecessor company, and the doctrine were thus applicable, liability would attach to Service on the basis that it was merely a continuation of the transferor. *See, e.g., Allied Int'l, Inc. v. International Long-*

*shoremen's Ass'n, AFL–CIO*, 814 F.2d 32, 36 (1st Cir.), *cert. denied*, —— U.S. ——, 108 S.Ct. 79, 98 L.Ed.2d 41 (1987); *Oman Int'l Finance, Ltd. v. Hoiyong Gems Corp.*, 616 F.Supp. 351, 361–63 (D.R.I.1985) (and citations therein).

**6.** Testimony of Quinn personnel and Quinn records indicate that Service removed at least 1,335 containers of hazardous waste from Quinn's Malden and Seabrook plants.

defendant. 42 U.S.C. § 9607(b)(3); *United States v. SCRDI, supra,* 20 ERC at 1756, 14 ELR at 20274-75.

The Court found above that there were releases and threatened releases of hazardous substances at the Mottolo site prior to governmental involvement. Therefore, governmental agencies could not be the sole cause of the releases, and a third-party defense is unavailable to Quinn.[7] *See, e.g., O'Neil, supra,* 682 F.Supp. at 728 ("defendants must demonstrate by a preponderance of the evidence that 'a *totally unrelated third party* is the *sole* cause of the release'") (emphasis in original) (quoting *Stringfellow, supra,* 661 F.Supp. at 1053, and citing *Dedham Water Co., supra,* 805 F.2d at 1079 n. 10); *Conservation Chem. Co., supra,* 619 F.Supp. at 235; Ruhl, *The Third–Party Defense to Hazardous Waste Liability: Narrowing the Contractual Relationship Exception,* 29 S.Tex.L.Rev. 291, 300–05 (Feb.1988).

Quinn also asserts it exercised due care in its dealings with Mottolo and Service. The due care provision of CERCLA is relevant only in connection with CERCLA § 107(b)(3).[8] In light of the Court's above finding that Quinn's § 107(b)(3) third-party defense is deficient from the outset because third parties were not the *sole* cause of the releases, whether Quinn took due care toward disposal of its wastes is irrelevant to its liability.

■ Quinn also asserts it was unaware of the location to which its hazardous wastes were being taken. Regardless of the anomalism of this argument in light of Quinn's concurrent assertion that it took "due care" with its waste, the argument is irrelevant given the Act's strict and explicit limitation of available defenses. A finding of potential responsibility under CERCLA § 107(a) is "subject *only* to the defenses set forth in [§ 107(b) ]" 42 U.S.C. § 9607(a) (emphasis added). CERCLA § 107(b) does not include a defense based on lack of knowledge. *See, e.g., O'Neil, supra,* 619 F.Supp. at 233–35; *United States v. Ward, supra,* 618 F.Supp. at 895, 897.[9]

■ With respect to defendants' equitable defenses, some courts have strictly construed the provision "subject only to the defenses set forth" contained in CERCLA § 107(a) as precluding all defenses not enumerated in the Act. Such courts have accordingly refused to entertain equitable defenses. *See, e.g., Bliss, supra,* 667 F.Supp. at 1304; *Stringfellow, supra,* 661 F.Supp. at 1061–62 (and citations therein). I find, however, that such a broad preclusion is both contrary to equitable principles and unwarranted by CERCLA's statutory language.

First, the relief plaintiffs seek is essentially restitution, which is an equitable remedy. *Mottolo, supra,* 605 F.Supp. at 913. Therefore, equitable defenses should be assertable. *See, Violet, supra,* 648 F.Supp. at 1294–95. Second, CERCLA § 101(32), 42 U.S.C. § 9601(32), provides that liability under CERCLA follows the liability standard set forth in CWA § 311, 33 U.S.C. § 1321. The Supreme Court has held that

---

7. Based on their allegation that negligent cleanup efforts were wholly or partly to blame for the release and threat of release at the Mottolo site, defendants also argue that material facts are in dispute as to whether they caused the releases which occurred. Because CERCLA's liability scheme does not require proof of causation, this argument is irrelevant. If the requirements of CERCLA § 107(a) are met and exceptions enumerated in § 107(b) are inapplicable, potentially responsible parties are liable whether they caused the releases or not. *See, e.g., New York v. Shore Realty Corp., supra,* 759 F.2d at 1044–45 (and citations therein); *Stringfellow, supra,* 661 F.Supp. at 1060–61; *Violet, supra,* 648 F.Supp. at 1290–93.

8. A defendant seeking to invoke the CERCLA § 107(b)(3) third-party defense must show "that he 'exercised due care with respect to the hazardous substances concerned and took precautions against any acts or omissions of the third party and any consequences foreseeably flowing from those acts or omissions.'" *O'Neill, supra,* 682 F.Supp. at 727 (quoting *Violet, supra,* 648 F.Supp. at 1293, and 42 U.S.C. § 9607(b)(3)(a)–(b)).

9. Although Quinn's assertions that it was not negligent and exercised due care may not be used to defeat liability, "such 'defenses' may be relevant to issues of apportionment of liability among the defendants at some later date." *Conservation Chemical Co., supra,* 619 F.Supp. at 204.

equitable defenses are to be considered when applying CWA § 311. *See Weinberger v. Romero–Barcelo*, 456 U.S. 305, 318, 102 S.Ct. 1798, 1806, 72 L.Ed.2d 91 (1982); *Conservation Chem. Co., supra*, 619 F.Supp. at 204–05. As a matter of logic, if two acts apply the same liability standard, and one act permits application of equitable defenses, so should the other. Finally, as the Supreme Court has stated,

equitable jurisdiction is not to be denied or limited in the absence of a clear and valid legislative command. Unless a statute in so many words, or by a necessary and inescapable inference, restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied. 'The great principles of equity, securing complete justice, should not be yielded to light inferences, or doubtful construction.'

*Weinberger, supra*, 456 U.S. at 313, 102 S.Ct. at 1803 (quoting *Porter v. Warner Holding Co.*, 328 U.S. 395, 398, 66 S.Ct. 1086, 1089, 90 L.Ed. 1332 (1946)). CERCLA § 107 neither explicitly restricts, nor even refers to, equity jurisdiction. The Court therefore finds and rules that defendants may assert equitable defenses. *See, e.g., Violet, supra*, 648 F.Supp. at 1294–95; *Conservation Chem. Co., supra*, 619 F.Supp. at 204–06 (and citations therein).

■ As their first equitable defense, Mottolo and Service allege that they gave consent to EPA to enter the Mottolo site based on EPA's representations it would not seek response costs in the future.[10] Mottolo and Service, Inc., argue that they detrimentally relied on these representations in giving their consent and that EPA should now be equitably estopped from pursuing the purportedly foresworn claims.[11] Alternatively, Mottolo and Service contend that the agency representations constitute a waiver and release of claims.[12]

To successfully assert estoppel against the Government, a party must establish both reasonable reliance on the Government's conduct to its detriment and "affirmative misconduct" by the Government. *United States v. Ven–Fuel, Inc.*, 758 F.2d 741, 761 (1st Cir.1985). In order for Mottolo and Service to establish that the act of giving their consent to EPA represented detrimental reliance on the agency's representations, they must first establish that they had the power to bar EPA from the site if they so desired.

Both CERCLA and CWA provide EPA with authority to immediately respond to contingencies involving hazardous substances. 42 U.S.C. §§ 9604(a)(1), 9607(k)(4)(D); 33 U.S.C. § 1321(c)(1). This authority implicitly authorizes governmental access to hazardous waste sites, for, otherwise, lacking a means of enforcement, the Act would be toothless. *See, e.g., United States v. Coleman Evans Wood Preserving Co.*, No. 85–211–Civ–J–16, slip op. at 3 (M.D.Fla. June 10, 1985) (order allowing EPA access to hazardous waste site over objection of defendants).

10. The purported assurances at issue here were made in oral and written communications between EPA personnel and Mottolo in June 1980. The Court need not determine whether these communications actually constituted assurances that EPA would not seek recovery because, as shown below, defendants' estoppel and waiver and release defenses fail on other grounds. For the same reason, the Court need not consider whether the EPA representative who made the purported representations had authority to do so. *See* 28 U.S.C. §§ 516, 519; *Federal Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 384, 68 S.Ct. 1, 3, 92 L.Ed. 10 (1947) ("[A]nyone entering into an agreement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority."); *United States v. Jones & Laughlin Steel Corp.*, 804 F.2d 348, 352

(6th Cir.1986); *Dresser Indus., Inc. v. United States*, 596 F.2d 1231, 1236–37 (5th Cir.), *reh'g denied*, 601 F.2d 586 (1979), *cert. denied*, 444 U.S. 1044, 100 S.Ct. 731, 62 L.Ed.2d 730 (1980).

11. Quinn also asserts estoppel on the basis of purported representations made by EPA at a May 17, 1983, settlement meeting. Statements made in the course of compromise negotiations are inadmissible as evidence and will not be considered. Rule 408, Fed.R.Evid.

12. In an earlier Order in this litigation, the Court rejected Mottolo's and Service's counterclaim for misrepresentation based on the same allegations. *See Mottolo, supra*, 629 F.Supp. at 60–61.

Additionally, several months prior to the initiation of cleanup activities, Mottolo entered into a stipulation with the State of New Hampshire in which he agreed that "[t]he State of New Hampshire, its contractors, agents and assigns shall have the authority to enter [the Mottolo site] at any time without notice to the defendants...." *State v. Mottolo*, No. E–952–79, at 2 (N.H. Sup.Ct. June 12, 1979) (court-approved stipulation). The State of New Hampshire requested EPA to conduct investigatory and cleanup procedures at the Mottolo site in the spring of 1980; therefore, even aside from its implicit authority under CERCLA and CWA to enter the site, EPA had authority to enter pursuant to the Stipulation and New Hampshire's request.

In sum, because it was unnecessary for EPA to seek permission to enter the Mottolo site, defendants cannot establish detrimental reliance. Therefore, their estoppel defense fails *ab initio*, and the Court need not consider whether the Government's actions constituted affirmative misconduct.[13]

■ Mottolo also alleges that the EPA's purported representations constitute a waiver and release of claims. For the same public policy reasons which disfavor the use of estoppel against the Government, *see supra* note 13, courts also take a dim view of waiver and release when asserted against the Government. *Albrechtsen v. Andrus*, 570 F.2d 906, 909–10 (10th Cir.1978).

A defendant seeking to invoke the defense must show either an "intentional relinquishment or abandonment of a known right or privilege," *Groves v. Prickett*, 420 F.2d 1119, 1125 (9th Cir.1970), or, if alleging implied waiver, "a clear, unequivocal and decisive act ... showing a purpose to abandon or waive the legal right," *United States v. Chichester*, 312 F.2d 275, 282 (9th Cir.1963). Here, in June 1980, when EPA was purported to have made the representations, CERCLA had not yet been enacted. Therefore, EPA could not have known what its rights were under the Act. Absent knowledge, there can be no intentional relinquishment. A waiver and release defense is therefore unavailable to defendants. *See Stringfellow, supra*, No. CV 83–2501, slip op. at 248–49.

■ Quinn next asserts that the intent of CERCLA is to provide potentially responsible parties an opportunity to participate in all stages of the cleanup process and that plaintiffs' failure to invite it to participate in the cleanup activities or the decision-making process contradicts this intent. From this premise, Quinn argues that plaintiffs should be barred from recovering any response costs.

The Government has no affirmative duty to consult with private parties before undertaking response actions. *See, e.g.*, 42 U.S.C.A. § 9613(k)(2)(D) (West Supp.1988) (SARA); *United States v. Miami Drum Serv., Inc.*, No. 85–0038–Civ–ARONOVITZ, slip op. at 25–26 (S.D.Fla. Dec. 12, 1986) [available on WESTLAW, 1986, WL 15327] ("would seriously undermine the expeditious cleanup of toxic waste sites"); *United States v. Medley*, 24 ERC 1858, 1860 (D.S.C.1986) ("merely encourages, rather than compels, responsible party participation in cleanups"); *Ottati & Goss, Inc., supra*, 630 F.Supp. at 1397. Accordingly, Quinn's defense fails.[14]

---

**13.** Defendants' estoppel defense also fails because they have not carried their heavy burden of establishing that the harm suffered by them in being denied use of the defense outweighs "the pressing public interest in the enforcement of congressionally mandated public policy." *United States v. Ven–Fuel, Inc., supra*, 758 F.2d at 761; *see also Pan Am. Petrol. & Transp. Co. v. United States*, 273 U.S. 456, 505–07, 47 S.Ct. 416, 424–25, 71 L.Ed. 734 (1927). Here, it is beyond peradventure that there is a pressing public interest in (1) ensuring the proper disposal of hazardous waste and (2) recovering expended funds for use in other recovery actions. The volume of hazardous waste has increased dramatically in recent years, and it is estimated that the vast majority of hazardous waste sites— of which nearly 20,000 have already been identified—post imminent danger to the environment. *See, e.g.*, Roberts, *Allocation of Liability Under CERCLA: A "Carrot and Stick" Formula*, 14 Ecology L.Q. 601, 603–04 (1987); *Developments in the Law, supra*, 99 Harv.L.Rev. at 1462–64; Blaymore, *Retroactive Application of Superfund, supra*, 12 B.C.Envt'l Aff.L.Rev. at 1–2 & nn. 1–3.

**14.** In its original objection to plaintiffs' motions, Quinn also asserted as an equitable defense that neither the State of New Hampshire nor EPA provided Quinn with formal notice pursuant to

To summarize, defendants' third-party and equitable defenses are deficient as a matter of law. Having previously determined that Quinn, Mottolo, and Service are potentially responsible parties under CERCLA § 107(a), and that releases and threatened releases of hazardous substances at the Mottolo site caused plaintiffs to incur response costs, the Court accordingly holds that Quinn, Mottolo, and Service not only are liable as a matter of law for the costs of removal or remedial action and obtaining injunctive relief, but also may be held responsible for making restitution for damage to natural resources stemming from conditions at the Mottolo site. 42 U.S.C. § 9607(a)(4)(A)–(C).

### 4. *Joint and Several Liability*

■ If the conduct of two or more persons liable under CERCLA has combined to violate the statute, liability under the Act is joint and several. *See Mays, Settlements with SARA: A Comprehensive Review of Settlement Procedures under [SARA]*, 17 ELR 10101, 10102, n. 7 (recent decisional law), 10102 & n. 12 (citations to legislative history of SARA indicating amendments did not affect CERCLA joint and several liability standard) (Apr.1987). On this basis, Mottolo, Service, and Quinn are jointly and severally liable. Furthermore, should Lewis and Sutera be found liable under CERCLA § 107 at a later date in connection with the Mottolo site, they also will be held jointly and severally liable for the harms caused at the site.

Quinn argues that unless the Court is able to resolve the liability of *all* defendants, it is precluded from determining whether joint and several liability is proper as to *any* defendants. This argument is without merit. *See NEPACCO, supra,* 579 F.Supp. at 845 & n. 26 (quoting *Austin v. Unarco Indus., Inc.,* 705 F.2d 1, 5 (1st Cir.1983) ("Joint tortfeasors are not con-

sidered indispensable parties under federal law."))

■ Quinn also argues that because issues of fact exist as to whether the harm caused at the Mottolo site can be feasibly apportioned between Quinn and the alleged co-generators, Lewis and Sutera, summary judgment is inappropriate as to Quinn's joint and several liability with the nongenerator co-defendants, Mottolo and Service. This argument is also without merit. The fact that apportionment might or might not be appropriate between parties does not preclude a finding as to the parties' joint and several liability. *United States v. Mirabile,* No. 84–2280, slip op. at 9 (E.D.Pa. Sept. 4, 1985) [available on WESTLAW, 1985 WL 97].

A defendant seeking to limit its liability on the ground that harm is capable of apportionment has the burden of proof to establish not only that the harm is divisible, but also that there is a reasonable basis on which to base apportionment. *See, e.g., Stringfellow, supra,* 661 F.Supp. at 1060; *Ottati & Goss, Inc., supra,* 630 F.Supp. at 1401. A determination as to divisibility may be made via summary judgment. *Stringfellow, supra,* 661 F.Supp. at 1060 (citing Restatement (Second) of Torts § 434 comment d (1976)). As to the Mottolo site, the harm was the presence of hazardous substances, the pernicious synergistic effects of their comingling, and the danger that toxic substances would migrate and pollute off-site locations. This harm is indivisible as between Quinn, Mottolo, and Service. *See, e.g., United States v. Northernaire Plating Co.,* 670 F.Supp. 742, 748 (W.D.Mich.1987); *Stringfellow, supra,* 661 F.Supp. at 1060. Of course, apportionment between Quinn, Lewis, and Sutera is not precluded if Lewis and Sutera are found liable at a later date, and the parties may bring an action for contribution amongst themselves.[15]

CERCLA § 112(a), 42 U.S.C. § 9612(a), prior to bringing the instant suit, and that this failure constitutes a jurisdictional bar to the action. However, in a later memorandum, Quinn recognized the futility of its argument in light of *Dedham Water Co., supra,* 805 F.2d at 1076–82, in which the First Circuit held that a party

seeking recovery under CERCLA § 107 need not first comply with the 60-day notice period set forth in CERCLA § 112.

**15.** CERCLA has ameliorative provisions to protect parties with disproportionately lesser fault than other parties from the potentially harsh

Plaintiffs' Damages

The parties contest several issues pertaining to the amount of response costs plaintiffs may recover.

### 1. Consistency of Response Costs with National Contingency Plan

■ Under CERCLA § 107, responsible parties are liable for all remedial or response costs incurred by federal and state governments stemming from the release or threatened release of a hazardous substance, so long as those costs are "not inconsistent with the national contingency plan ("NCP")." 42 U.S.C. § 9607(a)(4)(A). The NCP, which in essence provides that cleanup measures be cost effective, *O'Neil, supra,* 682 F.Supp. at 728 (and citations therein), is prescribed by CERCLA § 105, 42 U.S.C. § 9605, and published at 40 C.F. R. part 300 (1987). Defendants have the burden to show that governmental response costs are inconsistent with the NCP. *E.g., NEPACCO, supra,* 810 F.2d at 747–48; *O'Neil, supra,* 682 F.Supp. at 728 (and citations therein); *Ottati & Goss, supra,* 630 F.Supp. at 1395.[16]

Referring to testimony of its own experts purporting to find "virtually every aspect of the Government's response to be inconsistent with the NCP," Quinn asserts that "the government has failed to establish that it has incurred any response costs not inconsistent with the [NCP]" and that "the response of the government was inconsistent with the NCP from the very

beginning." Quinn Response (document no. 182) at 12. Quinn's assertions are unrealistic: the releases and threatened releases at the Mottolo site clearly required *some* response and expenditure of funds. Even accepting at face value Quinn's assertions that part of these expenditures were avoidable, some expenditures were clearly necessary and thus consistent with the NCP.

Liability hinges on whether plaintiffs incurred *any* response costs. 42 U.S.C. § 9607(a)(4). Plaintiffs have established this element of their case. Whether some of those response costs are inconsistent with the NCP is a triable issue of fact which goes to the amount, not the fact, of defendants' liability. *O'Neil, supra,* 682 F.Supp. at 729; *Dedham Water Co. v. Cumberland Farms Dairy,* 588 F.Supp. 515, 517–18 (D.Mass.1983). Merely because some response costs vary from the NCP does not provide defendants a complete defense to liability. *See O'Neil, supra,* 682 F.Supp. at 729; *Northernaire Plating Co., supra,* 670 F.Supp. at 747.[17]

### 2. Ancillary Costs and Prejudgment Interest

■ As stated above, CERCLA § 107(a) states that responsible parties are liable for "all costs of removal or remedial action." 42 U.S.C. § 9607(a) (emphasis added). CERCLA amendments (SARA) further specify:

results which might inhere from joint and several liability (for example, the generator who has disposed of only one out of numerous containers at a site). Persons who have paid or agree to pay response costs may seek contribution from any other person who is or may be liable under CERCLA § 107(a) during, following, or even in the absence of a civil action. *See* 42 U.S.C.A. § 9613(f)(1) (West Supp.1988); *Northernaire Plating Co., supra,* 670 F.Supp. at 748–49 (citing *United States v. SCRDI, supra,* 20 ERC at 1760 n. 8); *see also* Mays, *Settlements with SARA: A Comprehensive Review of Settlement Procedures Under [SARA], supra,* 17 ELR at 10109–10; *cf. supra* note 9.

**16.** In connection with another issue, the Court noted previously in this litigation that "in order to recover future cleanup costs plaintiffs would

have to show ... that the cleanup costs are consistent with the [NCP]." *Mottolo, supra,* 107 F.R.D. at 270. To the extent that this statement is contradictory to the Court's holding today, i.e., that *defendants* have the burden to show that response costs are inconsistent with the NCP, the Court's earlier statement mischaracterizes the burden of proof.

**17.** Also at issue for resolution at a later date are (1) whether the inconsistency of response costs to the NCP is determined by reference to the NCP existing when response costs were incurred or the current NCP, and (2) what the applicable standard of judicial review is in connection with the agency's response methodology. These legal issues are better addressed in conjunction with the factual issue of whether plaintiffs' costs were appropriate vis-à-vis the NCP.

The amounts recoverable in an action under [§ 107] shall include interest on the amounts recoverable under subparagraphs (A) through (D). Such interest shall accrue from the later of (i) the date payment of a specified amount is demanded in writing, or (ii) the date of the expenditure concerned.

42 U.S.C.A. § 9607(a) (West Supp.1988).

In view of this unequivocal statutory language and the Act's fundamental remedial purposes, the Court holds that plaintiffs may recover prejudgment interest, as well as all costs incurred in the course of rectifying conditions at the Mottolo site, so long as such costs are not inconsistent with the NCP. These allowable costs shall include all of plaintiffs' investigative and administrative expenditures and the costs of mounting this litigation, including attorneys' fees. *See, e.g.,* 42 U.S.C.A. §§ 9601(23) and (25) (West Supp.1988); *Wickland Oil Terminals v. Asarco, Inc.,* 792 F.2d 887, 892 (9th Cir.1986) (investigatory and testing expenses); *Shore Realty, supra,* 759 F.2d at 1042–43 (assessment of site conditions and supervisory expenses); *City of New York v. Exxon Corp.,* 633 F.Supp. 609, 617–18 (S.D.N.Y.1986) (investigation and testing); *NEPACCO, supra,* 579 F.Supp. at 851–52 (all litigation costs, including attorneys' fees, and salaries and expenses associated with monitoring, assessing, evaluating releases and taking ameliorative action); *cf. United States v. Malitovsky Cooperage Co.,* 472 F.Supp. 454, 458 (W.D.Pa.1979) (allowing prejudgment interest under CWA § 311, 33 U.S.C. § 1321; also holding that assessment of interest is necessary to "fairly compensate the Government" for monies advanced).

Prejudgment interest is appropriate from the later of: (1) February 3, 1983, the date on which plaintiffs made their initial demands on defendants; or (2) the dates on which expenditures were actually made. 42 U.S.C.A. § 9607(a) (West Supp.1988). The rate at which prejudgment interest shall be applied to the outstanding unpaid balance of the amounts recoverable from defendants shall be the same as that specified for interest on investments of the Hazardous Substance Superfund. *Id.*

## Conclusion

For the reasons set forth above, the Court herewith holds that plaintiffs' joint motion for partial summary judgment against all defendants (document no. 186) is granted in part and denied in part, as summarized below:

Summary judgment is an appropriate means of resolving some of the legal and purported factual issues in this litigation and is proper at this juncture;

CERCLA retroactively applies to all response costs incurred by plaintiffs without limitation to postenactment expenditures;

Quinn, Mottolo, and Service are potentially responsible parties under CERCLA § 107(a); however, no finding is made as to Lewis and Sutera;

Third-party and equitable defenses raised by Quinn, Mottolo, and Service are deficient as a matter of law;

Having been found potentially responsible parties under CERCLA § 107(a), and being unable as a matter of law to successfully interpose defenses, Quinn, Mottolo, and Service are liable as a matter of law for response and remedial costs incurred as a result of conditions at the Mottolo site;

Mottolo, Service, and Quinn are jointly and severally liable; should Lewis and Sutera be found liable under CERCLA § 107 at a later date in connection with the Mottolo site, they also will be jointly and severally liable for harm caused at the site;

The harm at the Mottolo site is indivisible and incapable of apportionment as between Quinn, Mottolo, and Service; apportionment between Quinn, Lewis, and Sutera is not precluded if Lewis and Sutera are found liable at a later date;

Defendants have the burden of showing that response and remedial costs incurred by plaintiffs are inconsistent with the NCP;

Whether specific response costs are consistent with the NCP is a triable issue of fact;

Plaintiffs may recover prejudgment interest dating from the later of: February

3, 1983, the date on which plaintiffs made their initial demands on defendants; or the dates on which expenditures were actually made;

The rate at which prejudgment interest shall be applied to the outstanding unpaid balance of the amounts recoverable from defendants shall be the same as that specified for interest on investments of the Hazardous Substance Superfund;

Plaintiffs may recover investigative and administrative expenditures and any expenditures associated with mounting this litigation, including attorneys' fees, so long as those costs are not inconsistent with NCP.

SO ORDERED.