**TOWN OF MUNSTER, Plaintiff,**

v.

**SHERWIN–WILLIAMS CO., INC., Defendant.**

**Civ. No. 90 CV 298.**

United States District Court, N.D. Indiana, Hammond Division.

June 23, 1993.

**198**

Steven P. Kennedy, Eugene M. Feingold, Munster, IN, for plaintiff.

Jane B. Amdahl, Joseph Van Bokkelen, Paul Leonard, Highland, IN, for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

RODOVICH, United States Magistrate Judge.

This matter was tried to the court on February 24, 25, 26, and March 3, 1993. At the close of the proceedings, the parties were afforded the opportunity to file post-trial briefs and findings of fact. This matter was fully briefed on May 10, 1993. Pursuant to Federal Rule of Civil Procedure 52(a), the court now makes the following Findings of Fact and Conclusions of Law.

### Applicable Law

In 1969, the plaintiff, the Town of Munster, purchased land to use as a sanitary landfill. The land was adjacent to the existing Munster landfill and was undeveloped. As early as the 1950s, a portion of the land was used for unauthorized dumping and has been called the "drum site." In 1985, the United States Environmental Protection Agency determined that the drum site contained hazardous wastes as defined by the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. § 9601 *et seq.*, and that Munster was a "potentially responsible party" as defined under CERCLA. In 1987, Munster removed the hazardous wastes from the drum site as directed by the EPA.

In 1990, Munster filed this private party contribution action against the defendant, Sherwin–Williams Company, Inc., under 42 U.S.C. § 9607(a), which states in part:

> Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section—
>
> \* \* \* \* \* \*
>
> (3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility owned or operated by another party or entity and containing such hazardous substances, ... [shall be liable for]
>
> \* \* \* \* \* \*
>
> (A) all costs of removal or remedial action incurred by the United States Government or a State not inconsistent with the national contingency plan;
>
> (b) any other necessary costs of response incurred by any other person

consistent with the national contingency plan; ...

Section 9607(b) further states:

There shall be no liability under subsection (a) of this section for a person otherwise liable who can establish by a preponderance of the evidence that the release or threat of release of a hazardous substance and the damages resulting therefrom were caused solely by—

(1) an act of God; ·

(2) an act of war;

(3) an act or omission of a third party other than an employee or agent of the defendant, ...

This court has jurisdiction under 42 U.S.C. § 9613(b) which states in part:

Except as provided in subsections (a) and (h) of this section, the United States district courts shall have exclusive original jurisdiction over all controversies [exclusive original jurisdiction over all controversies] arising under this chapter, without regard to the citizenship of the parties or the amount in controversy....

Under Section 9613(f)(1), anyone who is liable for clean up costs may seek contribution:

Any person may seek contribution from any other person who is liable or potentially liable under section 9607(a) of this title, during or following any civil action under section 9606 of this title or under section 9607(a) of this title. Such claims shall be brought in accordance with this section and the Federal Rules of Civil Procedure, and shall be governed by Federal law. In resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate....

■ Sherwin–Williams contends that Munster is barred from bringing this action by the doctrine of laches. As a general rule, a private party cannot assert equitable defenses against the government when it is acting in a sovereign capacity. *See Heckler v. Community Health Services of Crawford County, Inc.*, 467 U.S. 51, 60, 104 S.Ct. 2218, 2224, 81 L.Ed.2d 42 (1984) ("[T]he Government may not be estopped on the same terms as any other litigant.") ]; *Chesapeake & Delaware Canal Co. v. United States*, 250 U.S. 123, 125, 39 S.Ct. 407, 407–08, 63 L.Ed. 889 (1919) (the United States is not subject to laches when asserting sovereign or governmental rights); *United States v. Iron Mountain Mines, Inc.*, 812 F.Supp. 1528, 1545 (E.D.Cal.1992); and *United States v. Atlas Minerals and Chemicals, Inc.*, 797 F.Supp. 411, 416 (E.D.Pa.1992).

■ Courts are split ·on the issue of whether equitable defenses are available in a CERCLA private recovery action. One line of decisions does not allow equitable defenses to be asserted against a private party since they are not listed in section 9607(b). *See General Electric Co. v. Litton Indus. Automation Systems, Inc.*, 920 F.2d 1415, 1418 (8th Cir.1990) (an "unclean hands" defense was not allowed in a contribution action); *Smith Land and Improvement Corporation v. Celotex Corporation*, 851 F.2d 86, 90 (3d Cir.1988) ("caveat emptor" and "clean hands" defenses were not allowed in a contribution action); and *Kelley v. Thomas Solvent Company*, 714 F.Supp. 1439, 1451 (W.D.Mich. 1989). Since these courts have determined that section 9607(a) provides for strict liability subject only to the defenses enumerated in section 9607(b), no other affirmative defenses were permitted.

However, other courts have allowed equitable defenses to be asserted in a private contribution action. *See United States v. Marisol, Inc.*, 725 F.Supp. 833, 844 (M.D.Pa. 1989); *United States v. Mottolo*, 695 F.Supp. 615, 626–27 (D.N.H.1988); and *Mardan Corp. v. C.G.C. Music, Ltd.*, 600 F.Supp. 1049, 1056 n. 9 (D.Ariz.1984). These courts have based their decisions on several factors.

First, the language in section 9613 specifically indicates that contribution claims

shall be governed by Federal law. In resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate....

The statute specifically states that federal common law shall govern these actions and that the court shall utilize equitable factors in resolving the issues.

Second, the same policy considerations are not at issue in a private contribution proceeding as are involved in a case filed by the federal government. Although Superfund has been established to enable the federal government to remove all hazardous wastes, a contribution action is a means for the federal government to recover the expended monies from the culpable parties. In a private contribution proceeding, no monies have been expended from Superfund to remove the hazardous wastes. Therefore, the federal government has no direct interest in the outcome of the lawsuit.

Third, 42 U.S.C. § 9601(32) states that "liable" or "liability" under this subchapter shall be construed to be the standard of liability which obtains under section 1321 of Title 33 [the Clean Water Act (CWA)]. The Supreme Court has determined that all equitable defenses are available under the CWA. *See Weinberger v. Romero–Barcelo,* 456 U.S. 305, 318, 102 S.Ct. 1798, 1806, 72 L.Ed.2d 91 (1982). In *Mottolo,* the court stated:

As a matter of logic, if two acts apply the same liability standard, and one act permits application of equitable defenses, so should the other.

695 F.Supp. at 627.

Finally, these courts have determined that since the plaintiff in a contribution action is seeking equitable relief, the defendant should be able to assert equitable defenses. *See Merry v. Westinghouse,* 684 F.Supp. 852, 857 (M.D.Pa.1988); and *United States v. Conservation Chemical Co.,* 619 F.Supp. 162, 205 (W.D.Mo.1985).

Although the arguments against asserting equitable defense in a private contribution action under CERCLA are strong, the arguments in favor of equitable defenses are more persuasive. Therefore, the laches defense raised by Sherwin–Williams will be considered in this case.

■ In discussing the defense of laches, the Seventh Circuit has stated:

Laches is principally a question of the inequity of permitting a claim to be enforced. It is unlike limitation, which is based merely on time. Rather, laches is based upon changes of conditions or relationships involved with the claim. (citation omitted) In order to support a defense of laches, there must be a showing of both a lack of diligence by the party against whom the defense is asserted and prejudice to the defendant party....

This court has held consistently that under the two-prong test for laches the plaintiff bears the burden of explaining its delay to bring suit. (citations omitted) If the delay is inexcusable, then the defendant must show prejudice.

*Lingenfelter v. Keystone Consolidated Industries, Inc.,* 691 F.2d 339, 340 (7th Cir. 1982).

*See also Zelazny v. Lyng,* 853 F.2d 540, 541 (7th Cir.1988); and *Farries v. Stanadyne/Chicago Division,* 832 F.2d 374, 378 (7th Cir.1987). Thus, Munster bears the initial burden of explaining its delay in bringing suit. If the delay is inexcusable, Sherwin–Williams then bears the burden of proving that it has suffered prejudice by Munster's delay.

*Findings of Fact*

■ 1. The plaintiff is the Town of Munster, a municipal corporation located in Lake County, Indiana.

2. The defendant is Sherwin–Williams Company, Inc., an Ohio corporation authorized to do business in Illinois. Sherwin–Williams has facilities located in several areas including Chicago, Illinois, and Cleveland, Ohio.

3. Munster purchased a tract of land to be used as a sanitary landfill in 1969. Prior to that time, the land was owned by the National Brick Company, and a portion of the land had been used for unauthorized dumping by National Brick and others. Since this portion of land contained several drums and other containers, it has been referred to as the "drum site."

4. No effort was made to conceal the illegal dumping. The drums were left on the surface and exposed to the elements. A large portion of the drums could be seen by anyone walking through the area. Any con-

cealment was caused by vegetation, erosion or the disintegration of the drums.

5. At the time of the purchase, Munster did not inspect the property. Munster was operating an approved landfill and expected to expand the landfill to include the new property. The existing landfill was inspected quarterly by Munster employees. Pictures of the landfill indicate that the drum site was adjacent to the landfill. (Plaintiff's Exhibit 9, Mandon testimony, tr. 481–82)

6. In 1985, the United States Environmental Protection Agency (EPA) informed James Mandon, the Munster Director of Public Works and Assistant Town Manager, that a complaint was received from local residents about waste material located at the drum site.

7. The EPA hired Weston–Sper, an EPA contractor, to conduct a site assessment of the area. Weston–Sper conducted tests on the substances in the drums and determined that the drum site contained lead, chromium, zinc, antimony, cadmium, copper, methylene chloride, acetone, benzine, xylene, 4 methylpentanone, toluene, ethyl benzene, aniline, isophorene, naphthalene, benzidine, cyanide, PCB, arsenic, selenium, and silver. These substances were hazardous materials as defined by the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. § 9601 *et seq.* The Weston–Sper report concluded that these hazardous wastes presented a danger to the health and safety of the public. (Plaintiff's Exhibit 13)

8. The Weston–Sper report also indicated that a landfill employee "mentioned that he was aware of the drums, and that they had been present for several years." (Plaintiff's Exhibit 13)

9. On November 1, 1985, the EPA informed Munster that a portion of the land was contaminated with hazardous wastes in violation of CERCLA and that since Munster was a potentially responsible party under CERCLA, it was responsible for cleaning up the property.

10. Although Munster attempted to negotiate a consent decree which would allow it to conduct an independent investigation of the site, the EPA refused to enter into the consent decree.

11. On January 5, 1987, the EPA issued an Administrative Order under Section 106 of CERCLA requiring Munster to submit a work plan, a safety plan, and bid specifications to clean up the drum site.

12. After Munster accepted bids for the clean-up from several environmental engineering companies, Maecorp was awarded the contract on June 1, 1987.

13. In September and October, 1987, Maecorp performed the clean-up of the drum site. Myra Peak, the project manager for the Munster site, served as the liaison between Munster and the EPA. Verneta Simon, the EPA on-site coordinator, also was present at the site during the clean-up.

14. Maecorp "staged" the drums by setting them on land adjacent to the drum site. Any partially buried drums were excavated and moved to the staging area. Many of the drums were partially or completely deteriorated. (Mandon testimony, tr. 100) A total of 2,867 drums were found at the drum site, and 2,411 of these drums were empty. In addition, several hundred plastic bags also were found.

15. The drums then were numbered and recorded onto log sheets by Maecorp's field chemists. These log sheets included the size of the drum, the type of drum, the type of head on the drum, a description of the material and, if there were several layers of material, a description of each layer in terms of color, amount, and type. In addition, any markings on the drums were to be recorded onto the drum log sheets. (Peak testimony, tr. 179–81; Plaintiff's Exhibits 57 and 59)

16. Mandon testified that approximately 25 drums had some markings on them and that approximately 15 of those drums had markings identifying them as products of Sherwin–Williams. (Mandon testimony, tr. 566) However, Mandon and Peak both testified that the drum log sheets were not accurate. (Mandon testimony, tr. 566; Peak testimony, tr. 288–89) In addition, after comparing pictures taken at the site with the log sheets, Peak testified that markings on the drums as seen in the pictures were not con-

sistent with the log sheets. (Peak testimony, tr. 290–95; Plaintiff's Group Exhibits 59 and 57)

17. When a drum contained material, two samples were taken. One sample would be combined with other samples which appeared to be a similar material. These composite samples then were tested by Maecorp to determine if they were composed of the same material or for "compatibility." (Mandon testimony, tr. 132; Plaintiff's Exhibit 69) Samples then were sent to Suburban Laboratories for further testing. (Plaintiff's Exhibits 35 and 69) These tests also were used to determine where these materials could be disposed.

18. The report from Suburban Laboratories did not list the specific materials within each individual drum. (Plaintiff's Exhibit 35) No evidence has been presented to identify the contents of each drum.

19. It is undisputed that some of the drums contained several chemicals including PCBs, Arochlor 1254, 2 Hexanone, magnesium, arsenic, benzanthracene, selenium, chrysene, and pyrene. (Plaintiff's Group Exhibit 35; Plaintiff's Exhibit 51) In addition, there was evidence that the Sherwin–Williams' plant in Chicago did not utilize those chemicals. (Thomas testimony, tr. 626–27; Kuntz testimony, tr. 665)

20. Since several of the drums and containers were deteriorated, the soil was tested for contamination. The soil from one small area of the drum site was removed due to the contamination.

21. Before the clean-up began, Munster became aware that some of the dumping may have been caused by Sherwin–Williams. (Mandon testimony, tr. 497) This was confirmed during the clean-up project. The drum log sheets indicated that some of the drums had "Sherwin–Williams" or "Frederick Fischer" on them. (Plaintiff's Exhibits 57 and 59) Fischer was a manager in the Flush Department at Sherwin–Williams for several years. (Avignone testimony, tr. 607; Thomas testimony, tr. 631)

22. On July 27, 1988, Munster received final approval from the EPA stating that it was in compliance with the Section 106 Order.

23. No effort was made to contact Sherwin–Williams until March 24, 1989, when Munster notified Sherwin–Williams that it was liable under CERCLA as a generator or transporter of the waste materials found at the drum site. (Mandon testimony, tr. 497–500; Plaintiff's Exhibit 53)

24. On September 25, 1990, Munster filed this action contending that since Sherwin–Williams was a generator or transporter of the hazardous wastes, Munster was entitled to contribution from Sherwin–Williams for the clean-up of the drum site.

25. Munster has failed to explain why it did not inspect the property before purchasing it in 1969. The evidence is undisputed that a simple visual inspection would have revealed the presence of a large number of drums.

26. The evidence also is undisputed that Munster employees operating the landfill discovered the drums long before Munster was contacted by EPA in 1985. Munster has failed to explain why no remedial action was taken before EPA became involved in the case.

27. CERCLA became effective in 1980. Assuming arguendo that Munster had no state law remedies before 1980, it had federal statutory remedies for cleaning the drum site and seeking contribution from any responsible parties beginning in 1980. Munster has not explained why it did not take advantage of its rights under CERCLA before the EPA became involved in 1985.

28. Munster and EPA conducted negotiations between 1985 and 1987 when the Section 106 Order was issued. Once again, Munster has not explained why the negotiations lasted two years or why it did not contact potentially responsible parties during this time period.

29. The clean-up project was completed in October, 1987, and EPA issued its final approval on July 27, 1988. Munster did not contact Sherwin–Williams until March 24, 1989. Munster has not explained this additional delay in notifying Sherwin–Williams that it was a potentially responsible party.

30. It is undisputed that many of the drums were at least partially deteriorated in 1985. It also is undisputed that there are no records which reflect the exact contents of each individual drum.

31. It is undisputed that other companies or individuals deposited waste materials at the drum site. While the property was owned by National Brick, no effort was made to prevent anyone from dumping materials on the property. In addition, several chemicals were found at the drum site which were not traceable to Sherwin–Williams.

32. Of the 2,867 drums recovered, only 14 or 15 drums contained some marking which identified them as belonging to Sherwin–Williams.

33. The condition of the drums, the presence of chemicals not traceable to Sherwin–Williams, and the lack of records regarding the contents of each drum has prejudiced Sherwin–Williams' opportunity to present a defense to this action.

34. The failure to notify Sherwin–Williams after EPA inspected the drum site in 1985 has prevented Sherwin–Williams from conducting its own investigation into the problem. If Sherwin–Williams had been given the opportunity to conduct an on-site inspection, it would have been in a better position to analyze the hazardous materials and gather information concerning any markings on the containers.

35. Finally, the passage of time has diminished Sherwin–Williams' opportunity to present an adequate defense. Since all of the illegal dumping occurred before 1969, Sherwin–Williams has been restricted in its ability to retrieve its records or interview any employees who may have been involved in disposing of its waste materials.

*Conclusions of Law*

1. In order to prevail, the plaintiff must provide an excuse for the delay in bringing this action.

2. The defendant must establish that it suffered prejudice due to the plaintiff's delay in bringing suit.

3. In the instant case, Munster has failed to provide any excuse for the delay in bring-ing this action. It knew or should have known of the drum site as early as 1969.

4. Sherwin–Williams has established that it has suffered prejudice from the delay. The various drums and containers have deteriorated making it difficult to identify which drums and containers belonged to Sherwin–Williams. In addition, Munster failed to identify which hazardous substances came from Sherwin–Williams' containers or drums. Finally, the passage of time has decreased Sherwin–Williams' opportunity to formulate a defense.

5. Since Munster has failed to provide an excuse for its delay and since Sherwin–Williams has suffered prejudice, the doctrine of laches applies to bar this action. Sherwin–Williams is entitled to judgment against Munster.

---

For the foregoing reasons, the Clerk is ORDERED to enter judgment in favor of the defendant, Sherwin–Williams Company, Inc., and against the plaintiff, the Town of Munster.